# United States Court of Appeals

## For the First Circuit

No. 07-1188

UNITED STATES,

Appellee,

v.

MARKO BOSKIC,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Chief Judge,
Tashima[*] and Lipez, Circuit Judges.

Max Stern, with whom Patricia Garin, Jeffrey P. Wiesner, Alexandra H. Deal, and Stern, Shapiro, Weissberg & Garin were on brief, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

October 22, 2008

---

[*] Of the Ninth Circuit, sitting by designation.

**LIPEZ, Circuit Judge**.  This case requires us to address a number of important issues: the relationship between deceptive interrogation tactics used by law enforcement and the voluntariness of statements under the Fifth Amendment; the attachment of the right to counsel under the Sixth Amendment; and the applicability of the fundamental ambiguity and literal truth defenses in a false statement prosecution.  Appellant Marko Boskic, a citizen of Bosnia, was found guilty on two counts of making false statements in his applications for refugee status and permanent residency in the United States.  See 18 U.S.C. § 1546.  The government claimed that Boskic deceived immigration officials by concealing his service in the Army of the Republic Srpska, which has been held responsible for the massacre of 8,000 Muslim men and boys during the Bosnian War.

On appeal, Boskic cites two errors: (1) the district court should have granted his motion to suppress statements made during an interview with government agents because those statements were secured in violation of his Fifth and Sixth Amendment rights; (2) the court should have granted his motion for judgment of acquittal because the evidence was insufficient to support a finding of falsity in his two statements.  We find no error and affirm.

**I.**

We draw our account of the events at issue primarily from the evidence provided at Boskic's suppression hearing and trial. The facts underlying this appeal are largely undisputed. To the extent that the facts pertinent to the motion to suppress are contested, we rely on the district court's factual findings unless they are clearly erroneous. United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000). In the context of the motions for judgment of acquittal, we take the relevant facts in the light most favorable to the jury's verdict. United States v. Bucci, 525 F.3d 116, 121 (1st Cir. 2008).

**A. Background**

On February 17, 2000, Boskic, while in Germany, filed an Application for Registration for Classification as a Refugee, known as a Form I-590, which included questions regarding his past military service, his criminal history, and his reasons for seeking refugee status. Based on the information he provided on the Form I-590, Boskic was approved for refugee status. He immigrated to the United States later that year, settling in Peabody, Massachusetts. In April 2001, he filed an Application to Register as a Permanent Resident or Adjust Status, known as a Form I-485, which also included questions about his past military service and his criminal history. Boskic was granted permanent residency on June 29, 2002.

Alistar Graham, an investigator for the International Criminal Tribunal for the former Yugoslavia ("ICTY") between 2001 and 2005, collected information identifying Boskic as a member of the 10th Sabotage Detachment of the Army of the Republika Srpska in the course of his investigation of alleged war crimes in and around Srebrenica, Bosnia and Herzegovina. Acting on Graham's information, the Joint Terrorism Task Force ("JTTF") in Boston, which included representatives of Immigration and Customs Enforcement ("ICE"), the Federal Bureau of Investigation ("FBI"), and the United States Attorney's Office, initiated an investigation in the fall of 2002 to determine whether Boskic had committed immigration fraud by failing to disclose on his I-590 and I-485 forms that he had been a member of the 10th Sabotage Detachment of the Army of the Republika Srpska. The JTTF also had information indicating that Boskic had a criminal record prior to entering the United States, which Boskic had not listed on his immigration forms.

The primary agents on this investigation were FBI Agent Greg Hughes, ICE Agent Thomas Carroll, and Assistant U.S. Attorney Kimberly West. Graham assisted these JTTF agents but was not a primary agent. He provided evidence identifying Boskic as a member of the 10th Sabotage Detachment, including video footage of Boskic's participation in that unit. Graham was motivated to help the JTTF agents in their investigation of Boskic because, in part,

he hoped that he could obtain Boskic's assistance in the ICTY's investigation of senior military officials involved in the Srebrenica massacres.[2]

In the spring of 2004, the JTTF agents learned that Boskic had submitted an application for travel documents. Acting upon this information, they devised an immigration interview concerning the travel documents as a ruse for an interview regarding Boskic's past military service. The JTTF planned to obtain an arrest warrant before the interview, but not to disclose to Boskic at the outset of the interview that he was under criminal investigation. ICE Agent Carroll would start the interview. Once Boskic's criminal history had been raised, FBI Agent Hughes would join the conversation. Then, Graham would enter the interview room with an interpreter to solicit information from Boskic about the 10th Sabotage Detachment.

In response to a notice to appear, Boskic arrived for his interview at the JFK Federal Building in Boston, Massachusetts on August 25, 2004 at 3:30 p.m. Consistent with the plan, JTTF had secured an arrest warrant charging Boskic with two counts of immigration fraud.

---

[2] During the Bosnian War, the United Nations designated Srebrenica as a safe haven. However, in July 1995, Bosnian Serbs violently took control of Srebrenica and killed 8,000 Bosnian Muslim men and boys, an act which has since been characterized as genocide. See Marlise Simons, Court Declares Bosnia Killings Were Genocide, N.Y. Times, Feb. 27, 2007, at A1.

## B. Interviews

Carroll met Boskic in the reception area, introducing himself as "Tom Carroll" and escorting Boskic to the interview room. Once they entered the room, Carroll asked Boskic to remain standing so that he could administer an oath.[2] After Boskic completed the oath and sat down, he was provided with a form advising him that he had the right to remain silent and to receive the assistance of counsel. See Miranda v. Arizona, 384 U.S. 436 (1966). These Miranda warnings were written in English on one side of the form and in Serbo-Croatian on the other side.[3] Carroll read Boskic his Miranda warnings in English with Boskic reading along. Boskic signed the English side, on which Carroll had already

---

[2] Carroll asked Boskic, "Do you swear all the statements you're about to give will be the whole truth, so help you God." Boskic responded in the affirmative. Carroll testified that this oath was administered in all immigration interviews.

[3] The form, entitled "United States Department of Justice, Immigration and Naturalization Service, Warning as to Rights," said:
> Before we ask you any questions, you must understand your rights.
> You have the right to remain silent.
> Anything you say can be used against you in court, or in any immigration or administrative proceeding.
> You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
> If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

written the date and time, and then read the Serbo-Croatian side of the form before signing it and noting the date and time.[4]  Carroll asked Boskic whether he understood what he had read and Boskic said that he did.

At the outset of the interview, Carroll examined Boskic's passport and determined that Boskic did not need the travel documents for which he had applied because Boskic had the proper stamp in his Bosnian passport indicating that he was a permanent resident of the United States.  Although Carroll informed Boskic that he did not need additional travel documents, Boskic insisted, based on information from a friend, that he could not travel on his Bosnian passport because Bosnia and Herzegovina had recently issued a new series of passports.  According to the district court, Boskic continued with the interview because he believed that the purpose of the interview was to go over his application for a re-entry permit.

Boskic spent forty-five minutes providing basic biographical information, such as his date of birth, when he came to the United States, and his reasons for applying to travel.  Then Carroll asked Boskic about his prior military experience.  Boskic

---

[4] The following language labeled "waiver" was located directly above the signature block: "I have read this statement of my rights and I understand what my rights are.  I am willing to make a statement and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

responded that he had fulfilled the two-year mandatory military service for the Yugoslav Army in 1983 and 1984. When explicitly asked whether he had any additional military experience, Boskic said "no." Similarly, Boskic denied having a criminal record in Bosnia. Carroll then told Boskic that he had information about Boskic's criminal record and needed to bring in the FBI to assist with the questioning.

At that point, Carroll left briefly and returned with Hughes. Carroll gave to Boskic what he described as a condensed version of the Miranda warnings, reminding Boskic that his Miranda rights were still in effect and that he was still under oath. In response to Hughes' questioning, Boskic said that he was from Bosnia but denied having been a soldier in the Bosnian War. When Hughes confronted Boskic with his Bosnian criminal record, Boskic claimed that the charges had been fabricated by Muslim officials who were punishing him for declining to join their army. Hughes questioned Boskic for about fifteen minutes before telling him that there was another person who wanted to speak with him. Hughes then left the room, returning with Graham and a Serbo-Croatian interpreter.

When Graham and the interpreter entered, Carroll once again reminded Boskic that his Miranda rights were still in effect. Graham introduced himself as an investigator from the ICTY and asked whether Boskic wanted to continue the interview using the

interpreter, which Boskic elected to do. Graham instructed Boskic to listen to what he had to say and then proceeded to talk for approximately ten minutes about his investigation of the events associated with the massacre at Srebrenica. Graham told Boskic that he knew Boskic had been part of the 10th Sabotage Detachment and that he had video footage of Boskic participating in that unit's award ceremony. Then Graham told Boskic that Boskic was not the subject of his investigation.

At that point, Graham asked Boskic if he wanted to talk to him or to watch the video. Boskic elected to do the latter. He confirmed his identity in the video and commented that he knew this day would come. After repeating that Boskic was not the subject of his investigation, Graham asked Boskic for his cooperation. Boskic agreed to help and, according to Graham, said that "if he was to go down for what happened, others would go down as well." Then Boskic described his involvement in the Branjevo Military Farm massacre and talked about his role in the genocide at Srebrenica. When they took a break around 6:00 p.m., snacks were provided.

After the break, the three agents -- Carroll, Hughes, and Graham -- all questioned Boskic for another hour. Boskic agreed to let them search his home as well as his car so they could find information about other people who were involved in Srebrenica.[5]

---

[5] We need not discuss the evidence found at Boskic's home and in his car because Boskic does not challenge the admission of this evidence on appeal and it does not figure prominently in Boskic's

-9-

At the end of the questioning, Carroll and Hughes spent ten to fifteen minutes convincing the reluctant Boskic to put his story into a written statement. The agents claimed that it would be advantageous for him to have the statement in his own words rather than relying on their version of his story.

At approximately 7:00 p.m., still working with the assistance of a Serbo-Croatian interpreter, Hughes dictated two sentences to Boskic, which Boskic wrote down in Serbo-Croatian to begin his statement: "I, Marko Boskic, understand and give up my rights. I am giving this statement voluntarily, without promises and guarantees." Hughes asked Boskic whether he understood that writing the statement was voluntary, to which Boskic responded in English: "If I'm writing this down, I know what I'm doing." Boskic then admitted in the statement that he served in the 10th Sabotage Detachment of the Army of the Republika Srpska and participated in the Srebrenica massacre, though he claimed his involvement was involuntary. Around 8:20 p.m., while he was still composing his statement, Boskic asked "What's going to happen tonight?" Carroll responded that they were going to hold him overnight and then bring him before a judge in the morning. Boskic asked whether he was going to be arrested. Carroll said that he would be arrested for immigration fraud.

convictions.

When Boskic had completed his statement, at approximately 10:15 p.m., Hughes suggested that Boskic also write that he had lied on his immigration forms. Boskic refused to do so, saying to Hughes, "Greg, if you had a woman that you loved and wanted to be with her, wouldn't you lie to keep her?" Boskic also said that he "knew what this was about when the FBI came in." Boskic was then arrested and transported to the Suffolk County House of Corrections.

## C. Procedural History

On September 24, 2004, a grand jury indicted Boskic on four counts of making false declarations on immigration documents in violation of 18 U.S.C. § 1546(a),[6] and one count of violating 18 U.S.C. § 1001 by making false material statements to government

---

[6] The four counts were as follows: (1) making a false statement under oath with respect to material facts on a Registration for Classification as a Refugee, Form I-590, by stating that he served only in the Yugoslav National Army and no other, (2) making a false statement under oath with respect to material facts on an Application to Register as a Permanent Resident or Adjust Status, Form I-485, by stating that he served only in the Yugoslav National Army and no other, (3) making a false statement under oath with respect to material facts on a Registration for Classification as a Refugee, Form I-590, by stating that he had never ordered, assisted or otherwise participated in the persecution of other persons because of race, religion and political opinion, and (4) making a false statement under oath with respect to material facts on an Application to Register as a Permanent Resident or Adjust Status, Form I-485, by stating that he had never ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion.

-11-

agents in his original immigration interview.[7] Prior to his trial, Boskic filed a motion to suppress, inter alia, the statements he made in the staged immigration interview. Boskic argued that his rights under the Fifth and Sixth Amendments had been violated in the interview. The district court denied the suppression motion.

Boskic's eight-day jury trial began on June 26, 2006. In addition to the background information described above, the evidence included Agent Hughes' testimony that Boskic had told him that he had been advised while in Germany not to disclose his past military service if he wanted to move to the United States.[8] The government also called as a witness Dr. Arti Gehani, a volunteer with the International Rescue Committee ("IRC"), who helped Boskic complete his Form I-485 in April 2001. Although she did not specifically recall assisting Boskic, she testified that she typically read the questions on the form to the individuals with whom she worked, paraphrasing the English as she went along. She customarily translated the form's question about military service by asking if the applicant "had ever been in the military." The government also provided evidence that Boskic had characterized his English language skills as "good" on a form that was filed

---

[7] On this count, the pertinent false statement was that he had only served in the Yugoslav National Army, when in fact he had also served in the Army of the Republika Srpska.

[8] On cross-examination, Hughes acknowledged that his written report following the interview did not state that Boskic had told him about this advice.

-12-

contemporaneously with the Form I-485, and that this self-assessment was accurate.[9]

The jury convicted Boskic on the first two counts alleging violations of 18 U.S.C. § 1546(a) and acquitted him on the remaining counts. Boskic then filed a motion for judgment of acquittal on the two counts of conviction, which the court denied at sentencing in November 2006. The court sentenced Boskic to 63 months of imprisonment to be followed by three years of supervised release.

Boskic now appeals the convictions on the grounds that the district court erred in denying his motion to suppress and that the evidence failed to support the verdict. We analyze Boskic's claims relating to the motion to suppress first because our decision on this motion affects the record that we must consider in evaluating Boskic's motion for a judgment of acquittal. We precede that analysis with a summary of the district court's suppression decision.

## II.

Claiming that the agents used deceptive interview tactics that were tantamount to coercion in violation of his Fifth Amendment due process rights, Boskic moved to suppress all of the

---

[9] Boskic's self-assessment was corroborated by evidence that as of April 2001 he had been working at K-Mart for ten months and was in regular contact with the IRC in English regarding the status of his immigration documents.

statements that he made during the August 25, 2004 interview. Boskic also sought suppression for a violation of his Sixth Amendment right to counsel, claiming that the officers improperly conducted their interview in the absence of his attorney. The district court conducted a suppression hearing, at which Boskic and the three agents involved in the interview testified.

In its Memorandum and Order on the motion to suppress, the district court divided its analysis of Boskic's interview into three distinct periods: (1) Carroll's and Hughes' interview of Boskic, (2) Graham's interview of Boskic and the joint interview conducted by Carroll, Hughes, and Graham prior to 8:20 p.m., and (3) the joint interview by all three agents subsequent to 8:20 p.m. when Boskic became aware of the impending arrest. During the first period, Boskic provided basic biographical information and misrepresented his past military service as well as his criminal history to Carroll and Hughes. During the second period, Boskic described his involvement in the Branjevo Military Farm massacre and the events at Srebrenica, gave permission for the agents to search his home and car, and started memorializing his disclosures in writing. At 8:20 p.m., the beginning of the third period, Boskic asked whether he was going to be arrested. The agents responded in the affirmative. Nonetheless, Boskic completed his written statement and said to Hughes, "Greg, if you had a woman

that you loved and wanted to be with her, wouldn't you lie to keep her?"

Before the district court, Boskic sought to suppress statements made during all three of these periods.[10] He argued that the agents misled him as to the true nature of their investigation because they initiated the interview under the pretense that it was an immigration interview and because Graham said that Boskic was not the subject of his investigation. According to Boskic, this deception constituted a coercive official tactic that rendered his statements involuntary in violation of the Fifth Amendment. The district court agreed with Boskic's assessment that when Graham told Boskic he was not the subject of his investigation, the agents' "actions and silence were intended to create a false assurance that Boskic was not the subject of any domestic investigation."

Nonetheless, the district court explained that mere trickery by the police during an interrogation does not necessarily rise to the level of coercion. It then looked to the totality of the circumstances to assess whether the government had met its burden of proving the voluntariness of Boskic's statements. To that end, it considered the following statutory factors:

---

[10] On appeal, Boskic does not contest the district court's denial of his motion to suppress statements made before Graham started interviewing him.

(1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. § 3501(b).[11]  The court also noted that "[t]he Supreme Court has listed other potential circumstances that are relevant to the voluntariness of the confession."  See Withrow v. Williams, 507 U.S. 680, 693-94 (1993)(explaining that the court should consider the defendant's maturity, education, physical condition and mental health, in addition to the length of the interrogation and its location when considering the totality of the circumstances).  The court found that on balance these factors weighed in favor of voluntariness.  Therefore, the court rejected the Fifth Amendment due process claim.

On the Sixth Amendment claim, the court held that even though the agents had filed a criminal complaint against Boskic and obtained an arrest warrant before the interview, Boskic's right to counsel had not yet attached at the time of the staged immigration

---

[11] This provision is a subsection of 18 U.S.C. § 3501, which addresses the admissibility of confessions.

-16-

interview.  The court also noted that Boskic never invoked his right to counsel even though he was provided with the <u>Miranda</u> warnings.

**III.**

When considering challenges to a district court's denial of a motion to suppress, we review conclusions of law de novo and findings of fact for clear error.  <u>United States</u> v. <u>Jones</u>, 523 F.3d 31, 36 (1st Cir. 2008).  As such, we review de novo whether a statement is voluntary and review for clear error the subsidiary findings of fact.  <u>United States</u> v. <u>Rojas-Tapia</u>, 446 F.3d 1, 3 (1st Cir. 2006).  If any reasonable view of the evidence supports the denial of a motion to suppress, we will affirm the denial.  <u>United States</u> v. <u>Holloway</u>, 499 F.3d 114, 117 (1st Cir. 2007).

**A. Coercion**

1. The Standard for Determining Coercion

On appeal, Boskic focuses on two factors in making his involuntariness argument: the agents' deceptive interrogation tactics and the coercive nature of the immigration interview.  We have noted that Boskic received the <u>Miranda</u> warnings at least three times during the course of his interview with Hughes, Carroll, and Graham.  However, this case does not involve any claims by Boskic that the government failed to comply with the <u>Miranda</u> procedure, which applies only to custodial settings.  Boskic acknowledges that he was not in custody prior to 8:20 p.m., when he was told that he would be arrested.

-17-

Instead, Boskic argues that his statements during this non-custodial period, between Graham's assurance that Boskic was not the subject of Graham's investigation and 8:20 p.m., were involuntary because he was tricked into believing that he was not under investigation. Boskic also contends that his statements during the post-8:20 p.m. period, once he was informed that he was going to be arrested and the interview became custodial, were also involuntary because the taint from the involuntariness of the earlier coercion had not dissipated. Boskic further argues that even if the government's misrepresentation did not itself render his statements involuntary, the "quasi-coercive" nature of the immigration interview, in conjunction with Graham's misrepresentations, made his statements involuntary.

In evaluating whether a defendant's statements were voluntary, we must use the standard set forth in Colorado v. Connelly, 479 U.S. 157 (1986). There the Supreme Court stated that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fifth Amendment." Id. at 167. This standard reflected a shift in the Supreme Court's jurisprudence.

> Historically, the requirement that admissible confessions be 'voluntary' reflected a variety of values; these included deterring coercion, assuring reliability of confessions, and protecting the suspect's free choice whether to confess. Thus, at common law, confessions produced by promises not to prosecute or

-18-

> offers of leniency were often excluded as involuntary.

United States v. Byram, 145 F.3d 405, 407 (1st Cir. 1998). However, after Connelly, "only confessions procured by coercive official tactics should be excluded as involuntary." Id.

2. The Agents' Deception

Boskic argues that the agents' misrepresentations -- through assurances and silence -- constituted coercion sufficient to make his statements subsequent to Graham's arrival involuntary. He points to Graham's specific assertion that he was not under investigation, and the purposeful silence of Carroll and Hughes in the face of Graham's assurances. Indeed, Boskic emphasizes the district court's finding that he probably would not have spoken with the agents about his involvement in the Army of the Republika Srpksa if he had known that he was the subject of Carroll's and Hughes' investigation.

We have previously held that "trickery is not automatically coercion" and, "[g]iven the narrowed definition of coercion in Connelly, it would be very hard to treat as coercion a false assurance to a suspect that he was not in danger of prosecution." Byram, 145 F.3d at 408. The district court emphasized this language from Byram in rejecting Boskic's coercion argument. An understanding of Byram is critical for an evaluation of the arguments of the parties.

-19-

The defendant in Byram, who was not advised of his Miranda rights at the outset of a courthouse interrogation, agreed to cooperate in a murder investigation and to testify at the subsequent trial of his friend because he was assured that he was not "implicated in any of this," referring to the murder under investigation. Id. at 406. When he was later charged and tried for being a felon in possession of a weapon, a crime that he had admitted to during the police interrogation and while testifying at the friend's murder trial, he filed a motion to suppress these incriminating statements. Id. at 406-07.

Expressing concerns about the voluntariness of Byram's statements and the violation of his due process rights, the district court suppressed Byram's statements from both the courthouse interrogation and the trial. Id. at 407. The government appealed the suppression of the statements made at trial, but not those made during the courthouse interrogation, which the district court deemed custodial. Id. Although we affirmed in part the district court's suppression ruling on appeal, finding that the defendant's trial testimony was inadmissible against him because it was the "fruit" of a Miranda violation at the custodial interrogation, we rejected the defendant's alternative argument that his statements during the courthouse interview and on the witness stand were involuntary. Id. at 408-10. Recognizing that certain types of police trickery can constitute coercion, we held that a police statement that was

-20-

"literally true so far as the murder charge was concerned but a suggestio falsi as [it] pertains to a possible possession charge" was not such an instance. Id. at 409.

Boskic argues that the district court wrongly relied on Byram because Byram did not involve "consciously misleading conduct on the part of the government." Here, by contrast, there was a "carefully contrived and executed plan" to deceive Boskic into believing that he was not a target of any investigation. Byram does not support this distinction between contrived and unplanned trickery, given our statement there that "under Connelly[,] Byram's interview statement, like his trial testimony, would not be 'involuntary' even if he were deceived." Id. at 408. Nonetheless, Boskic argues that, on the question of coercion, we later drew the distinction in United States v. Flemmi, 225 F.3d 78, 91-92 (1st Cir. 2000), between statements by police officials that were inadvertently misleading and statements that were consciously misleading. Hence Flemmi, like Byram, is critical to an evaluation of the arguments of the parties.

The defendant in Flemmi was "one of Boston's most notorious gangsters" as well as an FBI informant. Id. at 80. Prior to his trial, the defendant filed a successful motion to suppress, arguing that incriminating evidence collected in connection with the FBI's electronic surveillance should not be admissible against him because he was promised use immunity by the FBI agents with whom he

was working.  Id. at 80-81.  On interlocutory appeal, we vacated the suppression order, holding that the promises of use immunity by the FBI agents were unenforceable.  We also rejected the defendant's argument that his statements were involuntary because the FBI agents' unauthorized promises of immunity induced his statements. Id. at 91.

In arguing that Flemmi modified Byram's holding on the relationship between police deception and coercion, Boskic points to our comment in a Flemmi footnote that there was "no evidence that [the FBI agents] intended to mislead Flemmi or tried to dupe him." Id. at 91 n.5.  Boskic insists that the absence of deceit was the primary basis for our decision that the official conduct was non-coercive.  This insistence is a misreading of Flemmi.  The lack of evidence of consciously misleading conduct on the part of the agents was cited as one factor in the totality of the circumstances test applied to the voluntariness question.  Moreover, we explained explicitly in Flemmi that the challenged statement would be viewed as voluntary "even if the government could be charged with deceit on this record."  Id.  Therefore, Flemmi does not modify the proposition set forth in Byram that "confessions procured by deceits have been held voluntary in a number of situations."  Byram, 145 F.3d at 408; Flemmi, 225 F.3d at 91 n.5.

Nevertheless, we acknowledged in Byram that "some types of police trickery can entail coercion," 145 F.3d at 408, citing the

example of <u>Lynumn</u> v. <u>Illinois</u>, 372 U.S. 528 (1963).  There, a suspect was told that she was in jeopardy of losing her children and her welfare benefits if she did not cooperate.  <u>Id.</u> at 534.  The unfounded threat by the police in <u>Lynumn</u>

> "did more than affect the suspect's beliefs regarding her actual guilt or innocence, and judgments regarding the evidence connecting her to the crime. It also distorted the suspect's rational choice . . . by introducing a completely extrinsic consideration: an empty but plausible threat to take away something to which she and her children would otherwise be entitled. This extrinsic consideration not only impaired free choice, but also cast doubt upon the reliability of the resulting confession . . . ."

<u>United States</u> v. <u>Boskic</u>, 2006 WL 1540488, at *16 (D. Mass. June 2, 2006) (emphasis omitted) (quoting <u>Holland</u> v. <u>McGinnis</u>, 963 F.2d 1044, 1051-52 (7th Cir. 1992) (internal citations omitted)).  Here, there were no such extrinsic factors that distorted Boskic's judgment about the evidence implicating him in making false statements to immigration authorities or that cast doubt on the reliability of his statements.  Although the fact that the agents allowed him to believe that he was not under investigation may have made him less guarded and self-protective, that deception alone did not make his statements involuntary.

3. Immigration Interview

Boskic asserts that "[e]ven assuming the deliberate misrepresentations made by the government are not enough, standing alone, to render [his] statements involuntary, when they are taken in conjunction with what the district court found to be the 'quasi-

-23-

coercive nature of the official immigration interview,' there can be no doubt that, under the totality of the circumstances, [his] will was overborne."  In support of this position, Boskic argues that he only spoke to the authorities because he believed his status as an immigrant required him to cooperate with Carroll, whom he believed to be an immigration official.  At the suppression hearing, Boskic testified that Carroll "works in the immigration status and he's in charge of me and I thought I had to answer his questions."

We agree with the district court that "the quasi-coercive nature of an official immigration interview in a federal building, whether the door is open or not, [is] a factor to be considered in deciding whether a confession was given voluntarily" because it would be "naive to ignore the perception -- indeed fear-- of all non-citizens in the United States that immigration authorities control their fate."  We also agree with the district court that the following factors weigh against voluntariness: (1) the agents' decision not to inform Boskic of the nature of the offenses that they suspected he had committed, (2) the absence of counsel during the interview, and (3) Boskic's nervousness and hesitancy at the outset of the interview.

However, we also agree with the district court that there are many other factors that weigh in favor of voluntariness.  The agents told Boskic on at least three occasions that he could remain

silent and that he could have the assistance of counsel if he so requested, even though they were not required to provide Boskic with <u>Miranda</u> warnings before 8:20 p.m., when the custodial portion of the interrogation began. From the outset of Graham's questioning, Boskic understood that he was being interviewed in connection with his involvement in the 10th Sabotage Detachment, and he told Graham that "if he [Boskic] was to go down for what happened, others would go down as well." The interview was not particularly lengthy. Boskic had regular breaks from questioning during which food and drink were offered. The interview room had adequate lighting, Boskic was never subjected to physical discomfort, and a translator was used once Graham began his questioning. In addition, Boskic was a well-educated, mature adult of forty years, who had a general familiarity with the American legal system and was in good mental and physical health. <u>See generally</u> <u>Withrow</u>, 507 U.S. at 693.

Additionally, when Boskic began to write his statement around 7:00 p.m., Carroll, through the interpreter, dictated the following phrase to Boskic: "I am giving this statement voluntarily, without promises and guarantees." Using the interpreter, Carroll asked whether Boskic understood the meaning of this phrase. Boskic responded in English, "If I'm writing this down, I know what I'm doing." When Agent Hughes later suggested that Boskic write in his statement that he lied on the immigration

-25-

forms, Boskic declined to do so. These choices and comments reflect Boskic's calculation, an understanding of his right not to cooperate or talk, and some measure of self-protection. Given all of these factors, we agree with the district court that the statements obtained from Boskic during the immigration interview were voluntary.[12]

## IV.

Boskic argues that the district court erred in concluding that his Sixth Amendment right to counsel did not attach when the law enforcement agents filed a criminal complaint prior to their interview with him. He further asserts that he did not waive his Sixth Amendment rights and that the statements he made during the interview should therefore be suppressed. In order to assess this contention, we must review some Sixth Amendment principles.

### A. Sixth Amendment Law

The Sixth Amendment provides that, "[i]n all prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has often explained that a criminal prosecution commences, and the right to counsel attaches, at or after "'"the

---

[12] Boskic argues that even though he received Miranda warnings, the statements obtained from him during the custodial interrogation after 8:20 p.m. were involuntary because his statements prior to that time had been involuntary. Having rejected the conclusion that the earlier statements were involuntary, we need not consider this argument any further.

-26-

initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."'" Rothgery v. Gillespie County, 128 S. Ct. 2578, 2583 (2008) (quoting United States v. Gouveia, 467 U.S. 180, 188 (1984) (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972) (plurality opinion))). The Court has emphasized that this

> rule is not "mere formalism," but a recognition of the point at which "the government has committed itself to prosecute," "the adverse positions of government and defendant have solidified," and the accused "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law."

Id. (quoting Kirby, 406 U.S. at 689).

Rothgery, the Court's most recent pronouncement on the Sixth Amendment right to counsel, establishes that the right attaches at least when the defendant first appears before a judicial officer. Id. at 2586. The Court observed there that "by the time a defendant is brought before a judicial officer, is informed of a formally lodged accusation, and has restrictions imposed on his liberty in aid of the prosecution, the State's relationship with the defendant has become solidly adversarial." Id.

It is equally well settled that the Sixth Amendment right may attach before a defendant first faces a judicial officer. The Court repeatedly has included the return of an indictment or the

-27-

filing of an information among the circumstances that constitute the "initiation of adversary judicial criminal proceedings" – events that do not involve the defendant's appearance before a judicial officer but that do require by rule the involvement of prosecutors.[13]  See, e.g., Rothgery, 128 S. Ct. at 2583; Moran v. Burbine, 475 U.S. 412, 429 (1986); Gouveia, 467 U.S. at 188; Kirby, 406 U.S. at 689.

---

[13] Both an indictment and an information must be signed by an attorney for the government, Fed. R. Crim. P. 7(c)(1), but the prosecutor's involvement in the grand jury's indictment process extends far beyond that ministerial role:

> [A] modern grand jury would be much less effective without the assistance of the prosecutor's office and the investigative resources it commands.  The prosecutor ordinarily brings matters to the attention of the grand jury and gathers the evidence required for the jury's consideration.  Although the grand jury may itself decide to investigate a matter or to seek certain evidence, it depends largely on the prosecutor's office to secure the evidence or witnesses it requires.  The prosecutor also advises the lay jury on the applicable law.

United States v. Sells Eng'g Inc., 463 U.S. 418, 430 (1983) (footnote omitted); see also, e.g., In re Grand Jury Proceedings, 219 F.3d 175, 189 (2d Cir. 2000) (observing that the grand jury "is an accusatory body under the (almost) complete control of the prosecutor"); 1 Charles A. Wright & Andrew D. Leipold, Federal Practice & Procedure § 101, at 289 (4th ed. 2008) ("It is . . . easy to overstate the grand jury's independence from the prosecutor.  It is the prosecutor who decides what investigations to pursue, what documents to subpoena, which witnesses to call, and what charges to recommend for indictment.").

If charged with a non-capital offense "punishable by imprisonment for more than one year," a defendant may be prosecuted by information, rather than indictment, if he waives his right to indictment.  Fed. R. Crim. P. 7(b).  An information is explicitly a prosecutorial undertaking; it is defined as "[a] formal criminal charge made by a prosecutor without a grand-jury indictment." Black's Law Dictionary 795 (8th ed. 2004).

At the same time, however, the Court has clarified that not every "'critical' pretrial event" comes with Sixth Amendment protection: "the possibility that [such an event] may have important consequences at trial, standing alone, is insufficient to trigger the Sixth Amendment right to counsel." Moran, 475 U.S. at 432. Rather, "[a]ttachment occurs when the government has used the judicial machinery to signal a commitment to prosecute . . . ." Rothgery, 128 S. Ct. at 2591.

With these principles in mind, we turn to Boskic's contention that the complaint filed by the agents in this case was "an accusation sufficiently formal, and the government's commitment to prosecute it sufficiently concrete" to trigger his Sixth Amendment right to counsel. Id. at 2589.

## B. Boskic's Right to Counsel

In arguing that the complaint charging him with criminal activity triggered the Sixth Amendment, Boskic necessarily relies on the Supreme Court's longstanding inclusion of "formal charge," along with indictment and information, in the list of events that signal the start of a criminal prosecution. See, e.g., Rothgery, 128 S. Ct. at 2583 (noting that adversary proceedings may be initiated by "formal charge, preliminary hearing, indictment, information, or arraignment") (citations omitted); Kirby, 406 U.S. at 689. A complaint prepared pursuant to Federal Rule of Criminal Procedure 3 is "a written statement of the essential facts

-29-

constituting the offense charged," and it must be made under oath before a magistrate judge or other judicial officer. If the complaint and attached affidavits establish probable cause to believe that the charged offense has been committed by the defendant, "the judge must issue an arrest warrant to an officer authorized to execute it." Fed. R. Crim. P. 4(a). Boskic reasons that the complaint is the first official accusation of criminal activity and that "the only logical conclusion" to be drawn from the issuance of an arrest warrant based on the complaint's showing of probable cause is that "the defendant has been formally charged with an offense."

The Supreme Court has never elaborated on what instruments beyond indictment and information would constitute a "formal charge" for purposes of the Sixth Amendment. However, every circuit that has considered the issue has concluded that a federal complaint does not qualify as such, primarily because of its limited role as the precursor to an arrest warrant. See United States v. Alvarado, 440 F.3d 191, 200 (4th Cir. 2006); United States v. Moore, 122 F.3d 1154, 1156 (8th Cir. 1997); United States v. Langley, 848 F.2d 152, 153 (11th Cir. 1988) (per curiam); United States v. Pace, 833 F.2d 1307, 1312 (9th Cir. 1987); United States v. Duvall, 537 F.2d 15, 22 (2d Cir. 1976); see also United States v. Harris, 45 F.3d 431, (Table), 1995 WL 7958, at *2 (6th Cir.

-30-

1994) (per curiam) (unpublished); <u>United States</u> v. <u>Santiago</u>, 180 F. App'x 337, 339 (3d Cir. 2006) (unpublished).

We agree with these courts. The process of securing a federal criminal complaint does not involve the appearance of the defendant before a judicial officer. It is therefore unlike a preliminary hearing or arraignment. Nor does the process of securing a federal criminal complaint require, by statute or rule, the participation of a prosecutor. It is therefore unlike the procedures for securing an indictment or information, which require the participation of a prosecutor and, in that sense, manifest the "commitment to prosecute" that is critical to the Supreme Court's Sixth Amendment jurisprudence. <u>Rothgery</u>, 128 S. Ct. at 2591.

Hence it is not surprising that the Court has never listed a "complaint" -- a commonly used method of initiating charges against suspected criminals -- as one of the specifically enumerated examples of events that trigger the Sixth Amendment right. That omission reinforces our view that, at least under federal law, the complaint is not a "formal charge" in the relevant sense for triggering the Sixth Amendment right to counsel. The federal complaint serves merely as the prelude to an arrest warrant and does not move a case from the investigative phase to the point at which the defendant "finds himself faced with the prosecutorial forces of organized society." <u>Kirby</u>, 406 U.S. at 689; <u>see</u> <u>also</u> <u>Alvarado</u>, 440 F.3d at 199 ("By its own terms, the Sixth Amendment

-31-

applies to 'criminal prosecutions' as opposed to criminal investigations.").[14]

We recognize that access to counsel may be helpful before the Sixth Amendment right attaches, particularly when suspects confront the custodial interrogations that are the hallmark of the investigative process. However, the Sixth Amendment is not directed at the risks of self-incrimination inherent in such confrontations; in those settings, suspects must instead rely on the Fifth Amendment and the prophylactic, now constitutionalized rule of Miranda.[15] The Sixth Amendment takes hold when the investigation gives way to a prosecution, broadly guaranteeing the defendant the assistance of counsel as he negotiates the intricate procedures of the adversary criminal system. "By its very terms," the Sixth Amendment "becomes applicable only when the government's role shifts from investigation to accusation." Moran, 475 U.S. at 430. That shift had not yet happened when Boskic entered the

---

[14] The transition from investigation to prosecution occurred here a day after the interview, when Boskic made his first appearance before a judicial officer. At that hearing, where he was represented by counsel, Boskic was advised of the criminal charges against him and did not oppose detention.

[15] In this case, of course, although Boskic was given Miranda warnings at the outset of the interview, he has never contended that he was in custody and entitled to the warnings when the interview began. His Fifth Amendment challenge to the admission of his statements is based on a due process/voluntariness argument rather than on the government's failure to comply with Miranda.

-32-

interview room.[16]  Accordingly, we reject his claim that the Sixth Amendment provided him with a right to counsel at the outset of the interview.[17]

---

[16] Other arguments that Boskic offers in support of his Sixth Amendment claim have no merit.  He asserts that the prosecution must have begun with filing of the complaint because the clock started running for speedy trial purposes at that time.  The Supreme Court has explicitly rejected that link between the Sixth Amendment's right to counsel and the right it provides to a speedy trial.  See Gouveia, 467 U.S. at 190 (noting the different interests at stake:  "While the right to counsel exists to protect the accused during trial-type confrontations with the prosecutor, the speedy trial right exists primarily to protect an individual's liberty interest . . . ."); United States v. Spagnuolo, 469 F.3d 39, 43 (1st Cir. 2006).  Nor is he correct in suggesting that we previously have held that a criminal complaint triggers the right to counsel.  In United States v. LaBare, 191 F.3d 60 (1st Cir. 1999), we did not address the issue because the government had assumed attachment of the right.  Id. at 64; see also United States v. Hilario-Hilario, 529 F.3d 65, 73-74 (1st Cir. 2008) (bypassing the question whether "a criminal complaint begins adversarial proceedings triggering a right to counsel" because defendant waived any such right).

[17] Given our conclusion, we do not reach the question of Boskic's possible waiver of his Sixth Amendment right to counsel. We note, however, that a valid waiver of Fifth Amendment rights typically will suffice to accomplish a waiver of the Sixth Amendment right to counsel in the context of police questioning of a defendant.  Patterson v. Illinois, 487 U.S. 285, 296 (1988). However, the Fifth and Sixth Amendment rights to counsel are not coterminous, and a waiver sufficient for Fifth Amendment purposes will not necessarily waive the Sixth Amendment right.  Id. at 296 n.9 ("[B]ecause the Sixth Amendment's protection of the attorney-client relationship – 'the right to rely on counsel as a "medium" between [the accused] and the State' -- extends beyond Miranda's protection of the Fifth Amendment right to counsel, there will be cases where a waiver which would be valid under Miranda will not suffice for Sixth Amendment purposes." (citation omitted)).  As an example, the Court in Patterson noted that a Miranda waiver was sufficient "where a suspect was not told that his lawyer was trying to reach him during questioning," but stated that, "in the Sixth Amendment context, this waiver would not be valid."  Id.

**V.**

Boskic also appeals his convictions on the ground that the district court improperly denied his motion for a judgment of acquittal. He contends that his failure to disclose his service in the Army of the Republika Srpska is insufficient evidence to establish that he made false statements in violation of 18 U.S.C. § 1546. We review rulings on motions for judgments of acquittal de novo, assessing whether a rational factfinder could have found each element of the offense beyond a reasonable doubt. United States v. Vazquez-Botet, 532 F.3d 37, 59 (1st Cir. 2008). We draw all reasonable inferences in favor of the verdict. Id. "We need not be convinced that a guilty verdict was the only one available on the evidence, but merely that a plausible rendition of the record supports the verdict." Id. at 60 (internal quotation marks and citations omitted). Therefore, "evidence sufficient to support a guilty verdict may be entirely circumstantial, and the factfinder is free to choose among reasonable interpretations of the evidence." Id. (internal quotation marks and citations omitted).

The elements of a § 1546(a) violation are: (1) the defendant made a false statement, (2) the statement was made knowingly and (3) under oath, (4) the statement concerns a "material fact," (5) and the statement was made in an application required by the United States immigration laws and regulations. See 18 U.S.C. § 1546(a); United States v. Chu, 5 F.3d 1244, 1247

(9th Cir. 1993).  Boskic explicitly challenges only the sufficiency of the evidence on the first element – whether he made false statements on his immigration forms.  However, resolving that issue requires us to consider his knowledge as well because, as we shall explain, whether his answers were false depends on his understanding of the questions asked of him.  See, e.g., United States v. DeZarn, 157 F.3d 1042, 1044 (6th Cir. 1998) ("[T]he crime of perjury depends not only upon the clarity of the questioning itself, but also upon the knowledge and reasonable understanding of the testifier as to what is meant by the questioning . . . .").

## A. Count One: Registration for Classification as a Refugee, Form I-590

On the Form I-590 provided to Boskic, there were nineteen questions that were posed simply.  For example, question thirteen regarding the applicant's educational background was entitled "Schooling or Education."  Beneath this heading was a table containing four rows and four columns.  The columns were labeled "Name and location of school," "Type," "Dates attended," and "Title of Degree or Diploma."  Using all four rows provided for the response, Boskic furnished the requested information about his educational background.

The next question, number fourteen, was entitled "Military Service."  Like the prior question on educational background, there was a table under the heading "Military Service." This table had two rows and five columns.  The columns were

-35-

labeled: "Country," "Branch and Organization," "Dates," "Serial No.," and "Rank Attained." Two rows were provided for a response and Boskic used only one of the rows. In response to country, he indicated "SFR Yugoslavia." He also indicated, as requested, that he had been in the infantry from 1983-84 and had attained the rank of private. He did not indicate his serial number, instead putting a dash in this box. At the end of the form, the following oath was signed by Boskic: "I, _____, do swear (affirm) that I know the contents of this registration subscribed by me including the attached documents, that the same are true to the best of my knowledge . . . and that this registration was signed by me with my full, true name."

Boskic acknowledges that he did not include references to his service in the Army of the Republika Srpska in response to the question about military service on his Form I-590. However, he contends that the jury could not find him guilty of making a false statement because that omission did not constitute the false statement that is required here. He points out that the oath on the form required him to swear only that the responses were "true to the best of his knowledge" and not that they also were complete.

Boskic concedes that deliberately omitting required information may properly be characterized as making a false statement in other contexts. See United States v. Wells, 519 U.S. 482, 485 (1997) (recognizing that concealing the nature of a

company's contractual obligations from several banks can constitute knowingly making a false statement to a federally insured bank). He contends that where a form does not explicitly require full disclosure, withholding information cannot be characterized as making a false statement under § 1546(a).

Boskic cites two cases in support of his position. In United States v. McCarthy, 422 F.2d 160 (2d Cir. 1970), the Second Circuit upheld the conviction of a union officer for making false statements by omission on a report filed with the Secretary of Labor. The oath on the pertinent report stated that the contents were "true, correct, and complete." Id. at 162. In the second case cited by Boskic, United States v. Mattox, 689 F.2d 531 (5th Cir. 1982), an employee who omitted information from an employment application was convicted of making a false statement. The instructions on the employment application required the defendant to write down "all" his past employment, and the form contained a certification that the information on the form was "True and Correct." Id. at 532.

Boskic reads these cases for the proposition that a defendant may be convicted for making a false statement by omission only if the underlying forms specify that the information provided is either true and complete or, alternatively, that all of the requested information has been provided. However, we read neither case as suggesting that the specific language used in the

respective forms was necessary to the court's decision to sustain the conviction. The courts merely found that the cited language was sufficient. Indeed, we see no material difference between the language used in the Form I-590 here and the language used in the forms in McCarthy and Mattox. The Form I-590 stated that "I ____, do swear (affirm) that I know the contents of this registration subscribed by me . . . are true to the best of my knowledge."

Our precedent confirms that the language proffered by Boskic as necessary for a conviction is not required. We have, in fact, upheld false statement convictions when the forms at issue did not have the language cited by Boskic. In United States v. Concemi, 957 F.2d 942 (1st Cir. 1992), defendants were charged with making false statements to a federally insured bank in violation of 18 U.S.C. § 1014. Id. at 944. The government alleged that the defendants had knowingly executed HUD-1 certificates that omitted information about pertinent secondary mortgages. The oath on these certificates stated: "The HUD-1 Settlement Statement which I prepared is a true and accurate account of this transaction." Id. at 947 n.7. This oath simply required the defendant to attest to the truth and accuracy of the information provided. The oath did not certify that the information was true and complete nor was there any reference to "all." Nonetheless, we found that this oath was sufficient to uphold the denial of a motion for a judgment of

acquittal on a charge of making false statements that took the form of omissions.  Id. at 950.

Similarly, in United States v. Leach, 427 F.2d 1107 (1st Cir. 1970), we held that defendants who omitted information on forms for a home improvement loan while swearing that the information provided was true were guilty of making false statements in connection with an application for a home improvement loan.  Id. at 1111.  In neither case did we indicate that it was problematic that the oath on the form did not explicitly require the applicant to attest to the completeness of his response.  As such, our precedent establishes that a jury can properly find that the defendant made a false statement by swearing that the incomplete answers to questions on a form are truthful even if the defendant does not also swear that the responses to the questions on the form are complete.

There is nothing unfair or illogical about this approach. While some forms might add "all" or "complete" to the description of information sought, the absence of those words does not suggest that only partial information is sought.  A request on a form that says "military service" plainly means that the details of all prior military service should be furnished.  Indeed, Boskic's response to question thirteen, listing all of his educational background in response to a similarly framed inquiry into his education and schooling, indicates that Boskic understood a complete response was

requested.  Also, he submitted the form in Serbo-Croatian, as well as in English.  Therefore, his understanding of what was asked of him was not limited by any lack of familiarity with the language in which the form was written.[18]  Accordingly, we affirm the district court's denial of the motion to acquit on Count One because a reasonable jury could have found that Boskic made a false statement about his military service on his Form I-590.  See United States v. Hatch, 434 F.3d 1, 6 (1st Cir. 2006) ("The government proved, and a rational jury found beyond a reasonable doubt, that the only sensible reading of [the question] demanded that [the defendant] report his entire . . . history.").

**B. Count Two: Application to Register as a Permanent Resident or Adjust Status, Form I-485**

Boskic also challenges the sufficiency of the evidence on Count Two, which alleged that he knowingly made a false statement under oath concerning a material fact on his application for permanent resident status.  Again, the statement at issue was Boskic's omission of his service in the Army of the Republika Srpska.  This time, the response was to question fourteen in Part C of Form I-485.  The instructions on the form stated:

> List your present and past membership in or affiliation with every political organization, association, fund, foundation,

_____

[18] Francis Monin, the Immigration Officer who interviewed Boskic in Germany and processed his application, testified that applicants submitted their forms in both their native language and English.  The applicants had the responsibility to obtain the English translations.

-40-

party, club, society or similar group in the United States or in other places since your 16th birthday. Include any foreign military service in this part. If none, write 'none.' Include the name(s) of the organization(s), location(s), dates of membership from and to, and the nature of the organization(s). If additional space is needed, use a separate piece of paper.

Boskic does not argue, because he cannot, that the question as written did not require a complete answer or that it was ambiguous with respect to the information requested. The question explicitly asks that Boskic provide his membership and affiliation with <u>every</u> organization listed. Although the use of "any" to modify "foreign military service" could, in a different context, suggest that listing some but not all past military service would suffice, in this context such a reading is not possible.[19] This question demands that the applicant list <u>every</u> past organizational affiliation or membership. The reference to "any foreign military service" indicates that all memberships or affiliations with a foreign military must be listed.

Instead, Boskic argues that the district court erred in denying his motion for a judgment of acquittal on Count Two because the government's own evidence suggests that he was responding to the question as it was posed to him by the IRC volunteer, Dr. Gehani, who testified that she did not read the questions on the form verbatim. Boskic reasons that since he was responding to the

---

[19] The Oxford English Dictionary provides multiple definitions for the word "any." Depending on the usage, "any" can mean "all" or it could connote "some."

question as paraphrased by Gehani, and the exact wording of that paraphrase is unknown, he cannot be found guilty of making a false statement.  He invokes the doctrines of fundamental ambiguity and literal truth in support of his contention.  See United States v. Richardson, 421 F.3d 17, 32-34 (1st Cir. 2005).

Because the falsity of an answer must be evaluated with reference to the question asked, see Bronston v. United States, 409 U.S. 352, 355 n.3 (1973), we begin by considering the content of the question that triggered Boskic's allegedly false response.

1.  What was the question?

As an initial matter, we reject Boskic's assertion that he may not be found guilty because there was no reliable evidence of the question Gehani asked him.  The government offered two possible scenarios for determining the question posed.  It attempted to show that Boskic had read and understood the form itself, which would have allowed the jury to attribute to him knowledge of the question as asked on the form irrespective of Gehani's translation.  Alternatively, the government elicited testimony from Gehani about her customary practice in translating question fourteen, see infra, and the jury could have concluded that she followed that practice with Boskic.  Whether the question asked by Gehani was "fundamentally ambiguous," precluding a finding that Boskic's answer to it was false, is a separate issue that we

take up only after discussing whether the relevant inquiry should focus on her question or the form's.

a. Did Boskic read and understand the I-485?

The government maintains that the jury could have found that Boskic read Form I-485 himself and that his English skills were sufficiently developed for him to understand that Form I-485 called for a response that included his service in the Army of the Republika Srpska. There are multiple problems with this argument.

Most significantly, the record lacks evidence that Boskic was capable of reading and understanding the I-485, which was submitted only in English. Although he unquestionably had acquired some ability to communicate verbally in English by the time he completed the form about a year after arriving in the United States, the government cites no evidence that he had written language skills at that time. It points out that Boskic checked off that his English ability was "Good" on another government form he completed the same day as the I-485, and that he had been employed as a cashier at a K-Mart, "confirm[ing] that he had the ability to communicate in English on at least a functional level." The government further cites telephone conversations with the IRC about the status of his application. However, none of this evidence speaks to Boskic's written language ability.

In addition, unlike his experience with immigration forms he completed in Germany, there is no evidence that Boskic had

access to a Serbo-Croatian or Bosnian version of the I-485. Boskic had submitted the I-590 in Germany in both English and Serbo-Croatian. Immigration Officer Monin, who interviewed Boskic in Germany, testified about another document that Boskic submitted there, the G-646, which asked applicants to confirm that they were not within any of sixteen inadmissible classes of aliens. The record contains Serbo-Croatian and English versions of the G-646 that were signed only by Boskic and a third version of the form, written in Bosnian, that was signed by Monin as well. Monin explained that, consistent with his usual practice, his signature would appear on the version of the form that the applicant signed in his presence after reading it. Thus, in Germany, Boskic read and relied on forms written in Serbo-Croatian or Bosnian.

Nor did Gehani's testimony provide any basis for an inference that Boskic had read the I-485 independently. Gehani wrote the answers on the form, and her testimony did not indicate that Boskic read along as she proceeded through the questions. The record is also silent as to whether Boskic read either the questions or the responses written by Gehani before he signed the document. Gehani testified that, even when her clients spoke English, she would complete the forms for them when they "were illiterate or they just didn't have a good command of written English."

The record thus contains insufficient evidence to permit the jury to conclude that Boskic had read and understood the I-485 form on his own.[20]

b. What Question Did Gehani Ask?

The question then becomes whether the jury could reasonably conclude that Boskic responded to a specific paraphrase of the form's question by Gehani. Gehani testified that she had no recollection of her particular encounter with Boskic, including whether he was accompanied by an interpreter. Although she stated that she did not use precisely the same wording each time she paraphrased, she testified that her customary practice with respect to Part C's question fourteen was to ask "clients if they had ever been in the military or in any political group either here or in another country." This evidence, viewed in the light most favorable to the verdict, permitted the jury to conclude that this customary question was the question Gehani asked Boskic. Indeed, it is the only version of the question that is supported by the record. Moreover, Gehani's customary paraphrase of the question -- which does not explicitly ask Boskic to report all of his military service -- is favorable to Boskic, who does not dispute that Gehani asked him some question about his military background. We therefore must determine whether Boskic could be found guilty on

---

[20] One judge on the panel disagrees.

Count Two because he responded to Gehani's question by reporting only his service in the Yugoslav Army.

2. Was Boskic's response on the Form I-485 false?

a. Fundamental Ambiguity

Boskic argues that he could not be found guilty for responding as he did to Gehani's question because he was asked only whether he had "ever" been in the military. He suggests that it was reasonable for him to conclude that disclosing any military experience was an appropriate and truthful response to that question,[21] and he relies on case law holding that a defendant may not be found guilty of making a false statement based on jury speculation about how the defendant understood a fundamentally ambiguous question. See, e.g., Richardson, 421 F.3d at 33 (holding that, in the case of a "fundamentally ambiguous" question, "'we cannot allow juries to criminally convict a defendant based on their guess as to what the defendant was thinking at the time the response was made'" (quoting United States v. Manapat, 928 F.2d 1097, 1101 (11th Cir. 1991))).

The flaw in Boskic's argument is that the question that he was asked was not "fundamentally ambiguous." We have recognized

_____

[21] Boskic argued in his reply brief that the evidence showed that his forced participation in the Army of the Republika Srpska was outside the scope of the question about military service. Arguments advanced for the first time in a reply brief are deemed waived, United States v. Marti-Lon, 524 F.3d 295, 299 n.2 (1st Cir. 2008), and we therefore do not address that contention.

-46-

a distinction between questions that are "truly ambiguous" and those that are "arguably ambiguous," and have held that only the former prevent a jury from deciding that the defendant's response was false. See Richardson, 421 F.3d at 33. Although we acknowledged the impossibility of "'defin[ing] the point at which a question becomes fundamentally ambiguous, and thus not amenable to jury interpretation,'" id. at 34 (quoting United States v. Farmer, 137 F.3d 1265, 1269 (10th Cir. 1998)), we endorsed a suggested formulation:

> A question is fundamentally ambiguous when it "is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony."

Id. (citations omitted). We have also posed this threshold question differently, asking in United States v. Rowe, 144 F.3d 15, 21 (1st Cir. 1998), if the record revealed any "objectively reasonable interpretation of the question under which the answer is not even false." See also United States v. Prigmore, 243 F.3d 1, 17-18 & n.2 (1st Cir. 2001) (citing Rowe for the proposition that defendants' intent should be assessed based on an interpretation of the pertinent statutory requirements that is "most congenial to their case theory and yet also objectively reasonable").

Although phrased differently, these inquiries serve the same purpose in a perjury or false statement trial involving an

ambiguous question.  They are questions that the court should pose to itself in deciding whether a reasonable jury, given the language of the question to the defendant and the context in which it was asked, could conclude beyond a reasonable doubt that the defendant knew that the answer he gave was false.  We have no reservations about concluding that a reasonable jury could make that determination here.

Question fourteen as paraphrased by Gehani was susceptible to two straightforward interpretations; it asked either for "sample" military service or for all such service.  The question for the jury was thus whether, despite the ambiguity of Gehani's language, Boskic knew that the Form I-485 asked him to disclose all of his military service and, hence, he knew that he had made a false statement by omitting his service in the Army of the Republika Srpska.  The jury's task was to "examine 'the question and answer . . . in the context of the investigation as a whole and the state of the defendant's knowledge.'"  Richardson, 421 F.3d at 32 (quoting DeZarn, 157 F.3d at 1048); see also id. at 33 ("In determining whether a statement made in response to an ambiguous question could be said to be false, 'the context of the question and answer becomes critically important.'") (quoting Farmer, 137 F.3d at 1269).

-48-

The district court properly charged the jurors with that specific task, directing them to determine how Boskic understood the question he was asked:[22]

> So what are you doing? What you're doing is asking what does this question ask? What was the question that was actually put to him? And because we have evidence regarding the way in which these questions were asked and the circumstances in which they were presented, you're going to have to . . . imaginatively project yourself into these circumstances. There has been a suggestion that an interpreter or translator paraphrased the questions in some fashion. You'll have to evaluate whether or not the substance of the question was presented to Mr. Boskic, and in response he responded falsely as the Government claims.
> Now, with respect to Counts 1 and 3, the Government says that the falsehood is an answer which can only reasonably be read to say that he belonged to the Yugoslav National Army and no other. So, you'll look at this question, the form in which the question is presented, and then you will think about how was the question actually presented to him, and then you'll think about did he know that what he was saying was false. . . .
> You turn to Count 2. And it focuses on the same kind of question, but you'll have to

---

[22] The jury instructions also relied on language from Rowe, telling the jurors that, "[i]f a question on the form at issue can be interpreted in more than one way, the Government must prove that the defendant's answer was false under any reasonable interpretation." See Rowe, 144 F.3d at 21. However, as we read our precedents, the question of objective reasonableness was for the judge to decide in considering whether the government had presented enough evidence to allow the jury to find the statement false. See Prigmore, 243 F.3d at 18 n.2 (recognizing that "a reasonableness determination sometimes requires preliminary resolution of factual disputes," but that, "as a legal question, the reasonableness of defendants' understanding is ultimately a question for the judge").

>look at it very carefully regarding military.
>How was it understood by the defendant?  Was
>his answer inaccurate, false, and did he know
>it to be false?

Given the context, the jury's judgment that Boskic's response was false is unassailable.  The Form I-485, like the Form 1-590, requested the details of the applicant's background.  The jurors were entitled to factor in Boskic's earlier experience with the I-590, which they supportably found to require disclosure of his entire military history, when considering his knowledge of the information about his military service sought by the government a year later.  They also heard the critical evidence that Boskic had been advised in Germany to avoid disclosing his service in the Army of the Republika Srpska to immigration authorities, and that he had said to FBI Agent Hughes, "if you had a woman that you loved and wanted to be with her, wouldn't you lie to keep her?"  Based on that evidence and his prior experience, and notwithstanding Gehani's imprecise paraphrasing, the jury reasonably could find that Boskic understood that the question posed by Gehani demanded disclosure of all of his military activity.  Hence, the jury properly found that Boskic's incomplete answer to question fourteen on Form I-485 constituted a false statement that he had served only in the Yugoslav Army.  See Hatch, 434 F.3d at 6 ("The government proved, and a rational jury found beyond a reasonable doubt, that the only sensible reading of Question 18 demanded that Hatch report his entire OUI history.").

b.  Literal Truth

The literal truth defense articulated in <u>Bronston</u> v. <u>United States</u>, 409 U.S. 352 (1973), arose from the Supreme Court's recognition that witnesses facing interrogation will at times give misleading answers when under pressure to respond.  The Court observed that "[s]ometimes the witness does not understand the question, or may in an excess of caution or apprehension read too much or too little into it."  409 U.S. at 358.  Insisting that "[p]recise questioning is imperative as a predicate for the offense of perjury," <u>id.</u> at 362, the Court held that "a jury could not be allowed to consider a perjury charge where the allegedly false statement was 'literally true but not responsive to the question asked and arguably misleading by negative implication.'" <u>Richardson</u>, 421 F.3d at 33 (quoting <u>Bronston</u>, 409 U.S. at 353).  In such instances, the questioner bears the burden to clarify the statement through additional inquiry.  <u>Bronston</u>, 409 U.S. at 358-59.  ("If a witness evades, it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination."); <u>United States</u> v. <u>Reveron Martinez</u>, 836 F.2d 684, 690 (1st Cir. 1988) ("Since the matter was not contemporaneously pursued, the government is saddled with what was <u>said</u>, rather than what might have been meant.").

The literal truth defense is inapplicable to the facts of this case, where the focus is on the ambiguity of the question asked. Bronston involved an unambiguous question, and a non-responsive answer that was literally true but misleading by negative implication.[23] That negative implication created an ambiguity in the response, which the questioner failed to resolve through appropriate follow-up questions. It is in that sense that the Bronston court explains the importance of precise questioning by the examiner.

Indeed, we question whether the literal truth defense as articulated in Bronston is appropriately invoked outside the context of adversary questioning. The Court expressly stated in Bronston that the defendant's response to "testimonial interrogation" should not "be measured by the same standards applicable to criminally fraudulent or extortionate statements." Id. at 358 & n.4. The Court elaborated:

> In that context, the law goes "rather far in punishing the intentional creation of false impressions by a selection of literally true

_____

[23] In Bronston, the defendant had been asked while testifying under oath at a bankruptcy hearing if he currently had any accounts in Swiss banks. 409 U.S. at 354. He answered no and then was asked if he ever had had such accounts. He replied: "The company had an account there for about six months, in Zurich." Both answers were true, although the defendant also had previously had Swiss accounts. The Court acknowledged the "implication in the answer to the second question that there was never a personal bank account," 409 U.S. at 357, but concluded that the lawyer should have followed up "to pin the witness down to the specific object" of the inquiry, id. at 360.

representations, because the actor himself generally selects and arranges the representations."  In contrast, "under our system of adversary questioning and cross-examination the scope of disclosure is largely in the hands of counsel and presiding officer."

Id. at 358 n.4 (quoting Model Penal Code).

At its core, Bronston is a reminder to the government that testimonial interrogation permits the government to resolve the ambiguities created by nonresponsive answers with follow-up questions.  The government may lose the opportunity to have a jury resolve the ultimate question of falsity if it is not alert to the need for those follow-up questions.  However, whether or not the literal truth defense is generally inapplicable to non-testimonial statements, it does not assist Boskic in this case.  There is no basis for disturbing the jury's verdict on Count II.

Affirmed.