# United States Court of Appeals
## For the First Circuit

No. 06-2247

UNITED STATES OF AMERICA,

Appellee,

v.

CHRISTOPHER SMITH,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lipez, Circuit Judge,
Selya, Senior Circuit Judge,
and Howard, Circuit Judge.

Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.
J. Gregory Batten for appellant.

December 21, 2007

**LIPEZ**, <u>Circuit Judge</u>.  Appellant Christopher Smith was charged, pursuant to 18 U.S.C. § 922(a)(6), with having falsely stated on a federal firearms transaction record that he had never been committed to a mental hospital.  He sought to suppress the record of his involuntary mental health commitment on the ground that it had been obtained through police records that were protected from disclosure by state law.  Additionally, he argued that federal regulations governing records at federally assisted drug abuse treatment programs precluded disclosure of the record of his involuntary commitment.

After his suppression motion was denied, Smith entered a conditional guilty plea, preserving his right to appeal the denial.  He now exercises that right and also appeals on the ground that the plea hearing, conducted by the district court pursuant to Federal Rule of Criminal Procedure 11, was deficient.  We hold that state law was not violated by the disclosures in this case and that the order of commitment is not a record to which the federal regulations governing records at federally assisted drug abuse treatment programs apply.  We also find that no error occurred during Smith's Rule 11 hearing.  We therefore affirm.

**I.**

The following facts are undisputed.  On April 2, 2005, Smith was involuntarily admitted to Acadia Hospital, a psychiatric hospital in Bangor, Maine.  This involuntary admission was

precipitated by his admission to the intensive care unit at Eastern Maine Medical Center ("EMMC") following a drug overdose. In the application section of an Application for Emergency Involuntary Admission to a Mental Hospital (a "blue paper"),[1] EMMC Nurse Practitioner Donna Huff explained:

> I believe Christopher Smith has a mental illness and due to mental illness, poses a likelihood of serious harm on the basis that Mr. Smith has a hx [history] of violent outbursts, threatening others and himself. He is here at EMMC in the ICU s/p [status post] overdose on a variety of medications. The last time he was admitted he fled before he was admitted. He is a flight risk. Therefore requesting Bangor PD.

Dr. Victor Kelmenson completed the certification portion of Smith's blue paper, concluding that he "pose[d] a likelihood of serious harm due to a mental illness because [of] amphetamine overdosed psychosis, hx [history] of suicidal ideation and paranoia, [and]

---

[1]"Blue paper" is the shorthand parlance for emergency involuntary admission applications in Maine because the forms are typically printed on blue paper. See United States v. Flanders, No. CRIM. 03-76-B-W, 2004 WL 444027 (D. Me. Mar. 4, 2004). Maine law provides for involuntary hospitalization for mentally ill persons who pose "a likelihood of serious harm." Me. Rev. Stat. Ann. tit. 34-B, § 3863. The procedure for involuntary commitment is as follows: first, an applicant completes an application indicating the grounds for his or her belief that the person to be hospitalized is mentally ill and poses a likelihood of serious harm. Id. § 3863(1). Then, a licensed physician completes a dated certificate to accompany the application, certifying that he or she has examined the patient and found him or her to be mentally ill and to pose a likelihood of serious harm. Id. § 3863(2). Finally, the application and accompanying certificate are reviewed and endorsed by a judicial officer. Id. § 3863(3). In practice, the application, certificate, and endorsement are all contained on a one-page form, known as the blue paper.

violent outbursts."  Later the same day, the Penobscot County Probate Judge completed the judicial review and endorsement section of the blue paper and authorized the Bangor police to transport Smith to Acadia Hospital.  Smith was subsequently hospitalized for about two weeks.

Less than four months later, on July 18, 2005, Smith went to Frati the Pawnbrokers, a federally licensed firearms dealer in Bangor, and completed ATF Form 4473 in anticipation of purchasing a gun.  Question 12.f on the form asked: "Have you ever been adjudicated mentally defective (which includes having been adjudicated incompetent to manage your own affairs) or have you ever been committed to a mental institution?"  Smith answered, "No."  On July 20, 2005, Erik Tall, a Bangor police detective assigned to an ATF Task Force, reviewed Smith's ATF Form.  Tall discovered from computerized records at the Bangor Police Department that Smith had been transported by two officers on April 2.  He then obtained a copy of the police report indicating that Smith had been transported from EMMC to Acadia Hospital for involuntary admission.

On July 25, Tall interviewed Smith and his mother, who both confirmed that Smith had been involuntarily committed in April.  The government then sought a court order, pursuant to regulations under the Health Insurance Portability and Accountability Act ("HIPAA"), 45 C.F.R. § 164.512(f), and Maine

-4-

law, Me. Rev. Stat. Ann. tit. 34-B, § 1207(1)(C), directing Acadia Hospital to turn over a copy of the blue paper authorizing Smith's involuntary admission. A magistrate judge granted this request, and the government received a copy of Smith's blue paper on August 30, 2005, confirming his involuntary admission and the inaccuracy of his answer on the ATF form.

Following his indictment on September 27, 2005 for knowingly making a false statement on the ATF Form, Smith moved to suppress the police reports related to his transportation to Acadia Hospital and the blue paper evidencing his involuntary admission. He argued that the police reports should be suppressed because they were obtained in violation of Maine's law designating "all orders of commitment, medical and administrative records, application and reports, and facts contained in them" as confidential records. Me. Rev. Stat. Ann. tit. 34-B, § 1207(1). He contended that the blue paper should be suppressed as a fruit of the illegally obtained police report and as a drug abuse treatment record, designated as confidential under the federal Public Health Service Act, 42 U.S.C. § 290dd-2.[2]

---

[2]As we discuss below, the Public Health Service Act (PHSA) renders confidential certain records of drug abuse diagnosis and treatment. 42 U.S.C. § 290dd-2. The PHSA and the regulations implementing it are distinct from and more protective than the nondisclosure requirements for "health information" established by HIPAA regulations. Compare 42 C.F.R. § 2.65 (establishing explicit criteria for a court to consider before authorizing disclosure of drug abuse records under the PHSA) with 45 C.F.R. § 164.512 (permitting the release of health information "in response to an

The same magistrate judge who issued the order directing the hospital to turn over the blue paper recommended that Smith's motion to suppress be denied, and the district court adopted her recommendation. Smith then agreed to enter a conditional guilty plea, preserving his right to appeal on the suppression issue. The district court conducted a plea hearing, described in further detail below, and accepted Smith's plea, sentencing him to fifteen months in prison and three years supervised release. Smith now appeals the denial of his motion to suppress the police report and the blue paper. He also appeals on the ground that the judge conducting his Rule 11 hearing improperly relied on a written document instead of directly and personally addressing him in open court about his understanding of the charge against him.

## II.

We review the denial of a motion to suppress under a bifurcated standard: questions of law are reviewed de novo, while findings of fact are reviewed for clear error. United States v. Charles, 213 F.3d 10, 17-18 (1st Cir. 2000). The facts underlying the motion to suppress in this case are not in dispute. As a result, our review is de novo.

### A. State Law

Smith argues that Tall violated state law, specifically Maine Revised Statutes title 34-B, § 1207, when he reviewed

order of a court").

computer records and a police report related to the transportation

of Smith from EMMC to Acadia Hospital.  Section 1207, located in a

chapter governing the Department of Behavioral and Developmental

Services, provides:

> 1. GENERALLY.  All orders of commitment,
> medical and administrative records,
> applications and reports, and facts contained
> in them, pertaining to any client shall be
> kept confidential and may not be disclosed by
> any person, except that:
>      . . .
> C.  Information may be disclosed if ordered by
> a court of record. . . .

Me. Rev. Stat. Ann. tit. 34-B, § 1207(1).[3]

Smith argues that Tall violated Maine law by improperly

obtaining and disclosing to federal prosecutors, without a court

order, the police report documenting the Bangor Police Department's

transport of Smith to Acadia Hospital.  This argument fails because

the police report is not a "report . . . pertaining to [a] client"

covered by § 1207(1).  A "client" is defined in this title of the

Maine statutes as "a person receiving services from the department

---

[3]Prior to 2007, unlawful disclosure of these records was punishable as a Class D crime.  Me. Rev. Stat. Ann. tit. 34-B, § 1207(4)(B).  The statute as amended now provides that "[d]isclosure of client information in violation of this section is an offense under the licensing standards of the mental health professional committing the violation and must be promptly reported to the licensing board with jurisdiction for review, hearing and disciplinary action."  Id. § 1207(4-A).  This revision provides further support for our conclusion that police records are not intended to be encompassed by the statute's confidentiality protections because such records are unrelated to the work of mental health professionals.

[of Behavioral and Developmental Services], from any state institution or from any agency licensed or funded to provide services falling under the jurisdiction of the department." Id. § 1001(2). Given that the Bangor Police Department is not a state agency or institution under this definition, Smith cannot be the police department's client. Thus, the police report is not a "report pertaining to a client." It follows that Tall's acquisition of the police report and his disclosure of it to federal prosecutors was not a violation of state law. Accordingly, we affirm the district court's denial of Smith's motion to suppress the police report. Because the police report was not illegally obtained, we also reject Smith's theory that the blue paper should be suppressed as a fruit of the police report.

## B. Federal Law

Smith also argues that the blue paper should be suppressed on federal law grounds. The Public Health Service Act (PHSA) makes certain drug abuse records confidential:

> Records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse . . . treatment [or] rehabilitation . . . which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall . . . be confidential and be disclosed only for the purposes and under the circumstances expressly authorized . . . .

42 U.S.C. § 290dd-2.  The regulations promulgated pursuant to this statute define "records" to mean "any information, whether recorded or not, relating to a patient received or acquired by a federally assisted alcohol or drug program."  42 C.F.R. § 2.11.  A "patient" is defined as "any individual who has applied for or been given diagnosis or treatment for alcohol or drug abuse at a federally assisted program."  Id.  "Drug abuse" is broadly defined to encompass "the use of a psychoactive substance for other than medicinal purposes which impairs the physical, mental, emotional, or social well-being of the user."  Id.

The application and certificate on Smith's blue paper contain diagnoses referencing drug abuse ("[status post] overdose on a variety of medications" and "amphetamine overdosed psychosis") and therefore are, arguably, records within the regulatory definition.[4]  The PHSA permits the use of such records to "initiate or substantiate any criminal charges against a patient" when authorized by "an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor."  42 U.S.C. § 290dd-2(b)(2)(C), (c).  The statute prescribes a general balancing test for assessing good cause, instructing the court to "weigh the public interest and the need for disclosure against the injury to the patient, to the physician-

_____

[4]The parties agree that Acadia Hospital is a "federally assisted program" under the regulatory definition.

-9-

patient relationship, and to the treatment services." Id.
However, the regulations promulgated under the statute articulate
a more specific five factor test to be applied when the records are
sought for use in a criminal investigation or a criminal
prosecution:

> A court may authorize the disclosure and use
> of patient records for the purpose of
> conducting a criminal investigation or
> prosecution of a patient only if the court
> finds that all of the following criteria are
> met:
> (1) The crime involved is extremely serious,
> such as one which causes or directly threatens
> loss of life or serious bodily injury
> including homicide, rape, kidnapping, armed
> robbery, assault with a deadly weapon, and
> child abuse and neglect.
> (2) There is a reasonable likelihood that the
> records will disclose information of
> substantial value in the investigation or
> prosecution.
> (3) Other ways of obtaining the information
> are not available or would not be effective.
> (4) The potential injury to the patient, to
> the physician-patient relationship and to the
> ability of the program to provide services to
> other patients is outweighed by the public
> interest and the need for the disclosure.
> (5) If the applicant is a person performing a
> law enforcement function that:
> (i) The person holding the records has been
> afforded the opportunity to be represented by
> independent counsel. . . .

42 C.F.R. § 2.65(d).

Although a court order was granted authorizing the
release of the blue paper for use in the government's investigation
and prosecution of Smith, none of the findings required by the
regulations were made. The explanation for this lack of findings

-10-

is simple: neither the government nor the magistrate judge granting the order had any reason to believe, at the time, that the blue paper referenced a drug abuse diagnosis and thus arguably included drug abuse information under 42 U.S.C. § 290dd-2. The magistrate judge explained in her ruling on the suppression motion that her order authorizing release of the commitment record was made pursuant to the HIPAA regulations, 45 C.F.R. § 164.512(a)(1) (permitting disclosure of health records pursuant to court order), and applicable state law, Me. Rev. Stat. Ann. tit. 34-B, § 1207 (permitting disclosure of orders of commitment pursuant to court order). She noted that when considering the government's request for an order authorizing disclosure of the blue paper, she "never for one moment considered whether the application might mention the word 'drugs' and therefore became a patient record within the meaning of 42 C.F.R. § 2.65(d)."

However, to resolve the suppression issue before us, we need not decide whether the application and certificate portions of the blue paper are patient records, nor whether the government would have been able to show that all five criteria required by § 2.65(d) were satisfied in this case. Instead, we focus only on the judicial endorsement portion of the blue paper. We do so for two reasons. First, the Maine law authorizing emergency admission, described supra note 1, suggests that the procedure involves three different forms: an application, a certificate, and a judicial

-11-

endorsement.  Although Maine has decided to use a single piece of paper to consolidate the application, certification, and endorsement steps  of the procedure, this happenstance does not necessarily mean that the three discrete portions of the form, filled out by three separate people, are all part of single "record" for the purpose of the PHSA.  In other words, the practical convenience of putting these three forms on a single piece of paper does not transform the judicial endorsement from a judicial order into a patient record.

Second, the government has no interest in introducing evidence of Smith's drug abuse at trial.  Its only interest is the introduction of evidence of the <u>fact</u> of Smith's involuntary commitment to a mental hospital.  That fact could be shown with a redacted copy of the blue paper that includes only the judicial endorsement.[5]  Thus, even assuming an error was made in ordering disclosure of the entire, unredacted blue paper (and we intimate no view on that question), the dispositive issue is whether the judicial endorsement on Smith's blue paper, with the application and certificate redacted, could be "used to initiate or substantiate any criminal charges against" Smith without the findings necessitated by the five factor test under the PHSA regulations.  Accordingly, we must determine whether the judicial

---

[5]At oral argument, the government stated that it would have agreed to stipulate to the fact of involuntary commitment rather than introducing the blue paper.

-12-

endorsement is a "record" to which the PSHA regulations restricting use apply. We hold that it is not.

The applicability statement in the PHSA regulations limits the broad definition of "records" when the "use" of information in a criminal case is at issue[6]:

> The restriction on use of information to initiate or substantiate any criminal charges against a patient or to conduct any criminal investigation of a patient applies to any information, . . . which is drug abuse information <u>obtained</u> by a federally assisted drug abuse program after March 20, 1972, . . . <u>for the purpose of treating . . . drug abuse, making a diagnosis for the treatment, or making a referral for the treatment</u>.

42 C.F.R. § 2.12(a)(2) (emphasis added) (internal citation omitted). The judicial endorsement on Smith's blue paper reads:

> Upon review pursuant to 34-B M.R.S.A. § 3863(3), I find this application and certificate to be regular and in accordance with the law, and I hereby authorize Bangor Police Dept to take Christopher Smith into custody and transport him to the Acadia Hospital.

It is dated and signed by the probate judge and indicates the address of the probate court. This endorsement contains no information that was obtained for the purpose of treatment, diagnosis, or referral; indeed, it contains no medical information

---

[6]When disclosure of records is at issue, the applicability of the regulations is further circumscribed by the requirement that the information "would identify a patient as an alcohol or drug abuser either directly, by reference to other publicly available information, or through verification of such an identification by another person." 42 C.F.R. § 2.12(a)(1)(i).

at all and no reference to drugs. Instead, it contains the statement of a judge authorizing the police to transport a patient to a hospital for emergency commitment. It is properly characterized as a judicial order and, as such, is far more akin to a court record than to a patient record of drug treatment.[7] The endorsement was "obtained" for the purpose of complying with Maine's emergency involuntary commitment statute, rather than for treatment, diagnosis, or referral. Because the endorsement contains no information to which the PHSA regulatory restrictions on use apply, it is not a "record" within the purview of those regulations.[8] As a result, the judicial endorsement may be used to

_____

[7]Under Maine law, "orders of commitment" are confidential and may be disclosed only by court order. Me. Rev. Stat. Ann. tit. 34-B, § 1207. That statute was fully complied with in this case. Additionally, we note that the Maine confidentiality law is phrased so as to distinguish between "orders of commitment" and "medical and administrative records." Id. The court order in this case orders Acadia Hospital to provide the blue paper as well as "any and all records relating to the fact of involuntary admission to hospitalization at Acadia Hospital of Christopher Smith, specifically EXCLUDING any records relating to substantive medical diagnosis or treatment." The order thus reflects the magistrate judge's sensitivity to the confidentiality of medical diagnosis and treatment records and confirms the judge's surprise when the blue paper itself contained such information. That surprise suggests that the state of Maine should consider using a two-page form for involuntary commitment to separate the substantive medical diagnosis from the judicial order authorizing commitment. This approach would allow the judicial order to be disclosed pursuant to court order under Maine law without risking a violation of these federal regulations in the future.

[8]We note that, in addition to containing no information obtained for the purpose of diagnosis, referral, or treatment, the judicial endorsement, by itself, would not identify Smith "as an alcohol or drug abuser either directly" or indirectly. As such, it

-14-

prosecute Smith without the findings required by 42 U.S.C. §
2.65(d). Accordingly, Smith's appeal of the denial of his motion
to suppress the blue paper is denied.

**III.**

Smith asserts a violation of Federal Rule of Criminal
Procedure 11 for the first time on appeal. He did not object
during the plea colloquy, nor did he move at any time to withdraw
his plea. As a result, our review is for plain error. United
States v. Vonn, 535 U.S. 55, 58-59 (2002); United States v.
Caraballo-Rodriguez, 480 F.3d 62, 69 (1st Cir. 2007). To establish
plain error, Smith bears the burden of demonstrating that: "'(1)
there was error; (2) the error was plain; (3) the error affected
the defendant's substantial rights; and (4) the error adversely
impacted the fairness, integrity, or public reputation of judicial
proceedings.'" Caraballo-Rodriguez, 480 F.3d at 69 (quoting United
States v. Riggs, 287 F.3d 221, 224 (1st Cir. 2002)).

Federal Rule of Criminal Procedure 11 requires a court to
conduct a plea colloquy, advising the defendant of his rights and
questioning him to establish that the plea is knowing and
voluntary. Fed. R. Crim. P. 11(b). The rule requires the court to
"determine that there is a factual basis for the plea," Fed. R.

---

contains no information to which the restrictions on disclosure
would apply. See 42 C.F.R. § 2.12(a). Accordingly, the court-
ordered disclosure of the redacted blue paper, including only the
judicial endorsement, would not have been error, even in the
absence of the findings required by 42 C.F.R. § 2.65(d).

Crim. P. 11(b)(3), and that the defendant understands "the nature of each charge to which the defendant is pleading," Fed. R. Crim. P. 11(b)(1)(G).

When conducting the colloquy, "the court must address the defendant personally in open court." Fed. R. Crim. P. 11(b)(1). We have repeatedly asserted that "a defendant's acknowledgment of signed agreements or other written documents will not suffice in lieu of the court's personal examination." United States v. Martinez-Martinez, 69 F.3d 1215, 1220 (1st Cir. 1995) (citing United States v. Martinez-Molina, 64 F.3d 719, 734 (1st Cir. 1995)); see also United States v. Medina-Silverio, 30 F.3d 1, 3 (1st Cir. 1994). However, we have also held that "where the prosecutor's statement . . . of the facts sets forth all elements of the offense and the conduct of the defendant that constitutes the offense, 'the defendant's admission that the allegations are true is sufficient evidence that he understands the charge.'" United States v. Cotal-Crespo, 47 F.3d 1, 6 (1st Cir. 1995) (quoting United States v. Darling, 766 F.2d 1095, 1099 (7th Cir. 1985)).

Smith argues that his Rule 11 proceeding was deficient in that "the trial judge failed to directly and personally address [Smith] in open court about [his] understanding of the law in relation to the alleged facts which would constitute the offense charged in the indictment, and instead, relied upon a written

document as a substitute for personal examination in determining that a factual basis for the plea existed." Smith is apparently claiming that the court improperly relied on the written indictment or on the Amended Government's Version of the Offense during the plea colloquy. However, the transcript of Smith's Rule 11 hearing does not support this contention.

In a thorough and organized fashion, the court began the Rule 11 hearing by questioning Smith directly about his competency to enter a plea. Finding him competent, the court then asked Smith about his understanding of the allegations in the indictment. Far from relying on a written document, the court conducted a lengthy and thorough inquiry into Smith's understanding of the offense charged:

> COURT: Mr. Smith, have you received a copy of the indictment?
> SMITH: Yes, your Honor.
> COURT: Have you had enough time to discuss the charge with your lawyer?
> SMITH: Yes, your Honor.
> COURT: Has Mr. Bate [defense counsel] explained to you the elements and nature of the offense charged?
> SMITH: Yes, your Honor.
> COURT: Has he also told you about the penalties that can be imposed?
> SMITH: Yes, your Honor.
> COURT: Mr. Bate, are you satisfied that your client understands the charge contained in Count One of the indictment and the penalties that can be imposed?
> MR. BATE: Yes, your Honor.
> COURT: Now, Mr. Smith, you're charged in a one-count indictment, and it alleges as follows, that on or about July 18, 2005, you attempted to acquire a handgun from Frati the

-17-

> Pawn Brokers in Bangor, and when you did so,
> you knowingly made a false, fictitious
> statement on the Department of Treasury,
> Bureau of Alcohol, Tobacco and Firearms
> firearms transaction record, A[T]F Form 4473,
> which statement was likely to deceive Frati
> the Pawn Brokers as to a fact material to the
> lawfulness of the attempted acquisition of the
> firearm and that you answered "no" to Question
> 2-F.    2-F read, "Have you ever been
> adjudicated mentally defective which includes
> having been adjudicated incompetent to manage
> your own affairs?" or "Have you ever been
> committed to a mental institution?" And that
> -- it further alleges that you knew at the
> time that answer was false and that is a
> violation of federal firearms law.  Do you
> understand the charge set forth in the
> indictment?
> SMITH: Yes, your Honor.

The court reviewed the range of penalties that could be imposed and told Smith that he would have the right to change his mind and withdraw his plea "up until the time that I accept your guilty plea if I decide to accept it."  The court then explained the rights Smith would give up by pleading guilty and the consequences of his conditional plea agreement.  Throughout this colloquy, the court repeatedly asked Smith if he understood what he was being told and he answered "yes, your Honor" each time.

Then, the court turned to its determination that there was a factual basis for the plea.  The court asked Smith whether he had been given an opportunity to review the amended version of the offense.  He replied that he had.  The court said, "I'm going to ask a very important question, Mr. Smith, and obviously I need a truthful answer.  Is there any respect with which you disagree with

-18-

what is set forth in the amended Government's version of the offense?" Instead of answering, Smith conferred with counsel. His attorney then responded to the question by carefully walking the court through a series of objections to factual details in the amended version of the offense.

In particular, Smith's counsel stated that Smith could neither admit nor deny the allegation that he had seen various signs on the walls of the hospital entrance while being transported to Acadia Hospital because he was medicated and had no recollection of the event.[9] Smith's counsel also contested the allegation that Smith had admitted to Tall that he should have answered "yes" to the question on the ATF form regarding involuntary commitment. Additionally, Smith's counsel indicated that he contested certain allegations regarding Smith's drug use.

Turning back to Smith personally, the court said, "[Y]ou've heard this conversation between me and your lawyer. And he has made certain points about whether or not you recognize[d] the signs and the nature of the conversation you had with Officer Tall. Have you followed the conversation that we've had?" Smith replied that he had. When asked, "Is there anything else in the amended Government's version that you believe is in any way inaccurate or incorrect?" Smith replied that there was not. The

---

[9]The signs would have been relevant to show that Smith was aware that he had been involuntarily admitted to a mental hospital.

court continued: "Is the information, to the best of your knowledge, except for what your lawyer has pointed out, true to the best of your personal knowledge?" Smith replied, "Yes, your Honor."

The court permitted the defendant to be seated at that point, but its Rule 11 colloquy continued. The court proceeded to recite in great detail the uncontested facts alleged in the amended version of the offense and how those facts would be sufficient to meet the government's legal burden in this case. Following this lengthy recitation of the facts and the law, the court concluded: "So I do find, based on my review of the prosecution version, Mr. Smith's responses, the responses of his attorney, that there is a factual basis for the guilty plea to the crime charged in . . . the indictment."

The court then questioned Smith personally regarding the voluntary nature of his plea. Smith continued to answer affirmatively to all of the court's inquiries. Before accepting the plea, the court asked Smith once again whether he still wished to enter the conditional guilty plea and Smith replied, "Yes, your Honor."

Far from relying on a written document in lieu of a true colloquy, this exchange between the court, Smith, and Smith's counsel parsed the factual details of the allegations in the written document and included a detailed oral exposition of the

factual basis for the plea.  Thus, we find no error, much less plain error, in the district court's Rule 11 colloquy in this case.

<u>          Affirmed</u>.