# United States Court of Appeals
## For the First Circuit

No. 09-1646

UNITED STATES OF AMERICA,

Appellee,

v.

JON R. HUGHES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

[Hon. John H. Rich III, U.S. Magistrate Judge]

Before

Torruella, Selya and Howard,
Circuit Judges.

Jeffrey W. Langholtz for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Paula D. Silsby, United States Attorney, was on brief, for
appellee.

April 8, 2011

**SELYA**, **Circuit Judge**. Defendant-appellant Jon R. Hughes appeals from the denial of his motion to suppress evidence obtained during a "knock and talk" interview, an ensuing search, and further interrogation at a later date. His appeal presents nuanced questions concerning the nature of the interview, the voluntariness of his statements, the legitimacy of his consent to the search, and the workings of the inevitable discovery doctrine. Applying deferential clear-error review to the district court's findings of fact, we uphold the denial of the defendant's motion to suppress in all particulars. Consequently, we affirm the conviction.

## I. BACKGROUND

We begin by rehearsing the raw facts as supportably found by the district court.[1]

On October 10, 2007, the computer crimes unit of the Maine State Police became privy to a tawdry tale: a fifteen-year-old girl, S.J., who had been the defendant's ward since age twelve, said that she had found nude photographs of herself on the defendant's computer. A detective, Laurie Lynn Northrup,

---

[1] The suppression hearing was held before a magistrate judge who made detailed findings of fact. Following objections to the magistrate judge's recommended decision, the district judge, upon de novo review, adopted the magistrate judge's findings of fact and legal conclusions. For ease in exposition, we take an institutional view and refer to these findings and conclusions in the aggregate as the findings and conclusions of the district court.

interviewed S.J. on October 15. By then, S.J. was no longer living with the defendant.

During the interview, S.J. stated that, in January of 2006, she had accessed the defendant's computer and saw inappropriate images that depicted her in the bathroom. She then searched the bathroom and discovered a hidden camera. When she confronted the defendant, he sent her an apologetic e-mail and admitted that he had peered at the nude images on his computer.

Detective Northrup consulted with her supervisor, Sergeant Glen Lang. They decided to forgo a search warrant due to the staleness of S.J.'s information and, instead, to conduct a "knock and talk" interview at the defendant's residence. A "knock and talk" interview, as the appellation implies, consists of knocking on a person's door, stating the purpose of the visit, and asking the person to agree to an audience. Because of overlapping jurisdictional concerns, the troopers informed both the Knox County sheriff's office and the Secret Service of their intent.

Up until the time when they involved the sheriff's office, the state police were unaware of earlier interactions between the defendant and Dr. Scott Schiff-Slater; the two had come in contact in mid-2007, in the course of the latter's labors as the "tele-med physician" for the town of Isle au Haut (where the defendant resided). These interactions led the doctor to call the sheriff's office on more than one occasion. Those calls culminated

in the receipt by the sheriff's office, on October 17, 2007, of a facsimile transmission from Dr. Schiff-Slater, attached to which was a copy of an office note memorializing the earlier series of telephone calls.  Therein, the doctor had conveyed his concern that the defendant might present a risk of danger to himself or others. As a precaution, the doctor solicited the cooperation of the sheriff's office in arranging for the defendant's involuntary commitment to a psychiatric care facility.  The doctor's records disclosed that the defendant had been hospitalized for depression, had suicidal tendencies, and was experiencing stress.  In an apparent response to forewarning about the planned "knock and talk," the fax stated in pertinent part:

> All of this, no matter what [Hughes] says, put[s] him in my mind at extreme suicide risk after he is confronted by the state police, as well as . . . extreme homicide risk, even if he states that he is fine.  If he was calm in these type[s] of police proceedings, this would not make me feel that he is any less at risk for suicidal/homicidal behavior. . . .

> [I]f the state police do not physically remove him from the island after he is confronted for possible accusations of pedophilia then I believe he needs to be blue papered[2] for his own safety as well as [that of] others.

---

[2] "Blue papering" is shorthand for involuntary commitment due to mental impairment.  See, e.g., United States v. Smith, 511 F.3d 77, 79 n.1 (1st Cir. 2007).

-4-

The district court found that the troopers knew of Dr. Schiff-Slater's communications with the sheriff's office when they went to see the defendant.

On October 18, a party of four — the two troopers, a deputy sheriff (Steve Johnson), and a Secret Service agent (Manning Jeter) — sojourned to the defendant's abode on Isle au Haut. Both troopers were in uniform and wore guns in holsters. Johnson and Jeter were dressed in civilian clothing and neither was carrying a visible weapon. Northrup brought along a recording device.

When the quartet arrived at the house in mid-morning, no one intended to arrest the defendant but, rather, to speak with him and then allow Johnson to escort him to a medical facility for involuntary commitment. Lang knocked, and the defendant came to the door. Lang informed him that the state police were conducting an investigation and wished to speak with him. The defendant was fully clothed and did not appear to be under the influence of drugs or alcohol. He freely permitted the officers to enter his home.

Lang and Northrup made it clear that the defendant was neither under arrest nor in custody. The interview took place in the living room and, with the defendant's acquiescence, was recorded. During most of the session, Lang and Northrup stayed in the living room, Jeter was in the kitchen, and Johnson wandered in and out of the house.

The defendant acknowledged that he had made video recordings of himself and his girlfriend in the bathroom. He also admitted photographing S.J. in the bathroom, but claimed that her involvement had been unintended. The troopers questioned this disclaimer, implying that the defendant had deliberately recorded the images of S.J. and transferred them to his computer.

At that juncture, the defendant said that he felt dizzy and told the troopers, for the first time, that he had not taken his antidepressant medication that day. He asked for a wet cloth, and Lang procured one. The defendant began hyperventilating and lay down on the floor. The troopers immediately called for an emergency medical technician (EMT).

The EMT who responded, Diane Barter, was the defendant's friend and neighbor. She determined that he had suffered a panic attack. The symptoms of the attack lasted for less than twenty minutes. After the symptoms had subsided, Barter confirmed that the defendant's vital signs were normal. When asked whether the defendant was "[a]ll good," Barter replied in the affirmative.

Once Barter left, the defendant asked if he could have a cigarette before the questioning resumed. The troopers escorted him outside for this purpose. While the defendant was smoking, Lang again asked him about the recorded images on his computer. The defendant demurred, stating that he would resume the conversation only after finishing his cigarette. The troopers

honored the defendant's preference. When the defendant finished the smoke, he took the initiative and spontaneously stated, "Okay, back inside." The protagonists repaired to the living room, and the interview resumed.

Lang asked the defendant to consent to a search of his home and computer. Anticipating what the troopers would find there, the defendant confessed that he had looked at pictures of young girls on the Internet. He called himself a "deviant" and expressed a fear that he would go to prison. He added that he had installed the camera in the bathroom for the purpose of photographing S.J.

These admissions were made without any prompting. In response, the troopers inquired about the location of the videotapes and DVDs on which the salacious images were stored. Instead of responding directly to this query, the defendant explained how the camera was rigged and asked if he would be going to prison. Lang assured him that he was not under arrest and told him that they did not intend to arrest him that day. Lang added, however, that the troopers did not want to leave the contraband in the defendant's possession.

The defendant clarified that he had recorded images only onto videotapes. He agreed to turn over the tapes, retrieved some of them from their hiding place in the bedroom, and handed them to the troopers.

Lang next asked the defendant to sign a consent-to-search form. The defendant voiced some uncertainty about why a formal consent was needed, saying that he could "voluntarily show [the troopers] everything." He then asked what would happen if he refused to sign the form. Lang replied that, regardless of whether he consented, the troopers were "probably" going to take "the stuff[]" with them. The defendant then signed the consent form. The troopers conducted a limited search, seizing two laptops (one of which was in plain view in the living room), two cameras, and several videotapes.

At the conclusion of the interview, the troopers informed the defendant that Johnson was prepared to take him to Penobscot Bay Medical Center (PBMC). When the defendant balked, Johnson handcuffed him. The defendant and the four law enforcement officers left Isle au Haut on the same boat.

Johnson brought the defendant directly to PBMC, where he was admitted. On the date of his scheduled discharge from PBMC (October 23), Lang and Northrup interviewed him in a hospital conference room. Prior to this time, the troopers had obtained a search warrant and searched the defendant's laptops in a forensically secure environment.

At PBMC, the troopers intended to question the defendant about some of the seized materials. This session, too, was recorded. At the outset, the troopers informed the defendant that

he was under arrest and read him his Miranda rights.  See Miranda v. Arizona, 384 U.S. 436, 444 (1966).  The defendant executed a waiver of those rights.  After some preliminary dialogue, the defendant expressed a reluctance to continue talking without a lawyer.  The troopers terminated the questioning at that point.

As the troopers escorted the defendant out of the building and into the parking lot, Lang realized that he had neglected to follow his ordinary practice and instructed Northrup to reactivate the recording device and ask the defendant whether he felt that the state police had treated him fairly.  Northrup complied, and the defendant replied, "I feel that I have been treated fairly.  I think you've explained everything to me. . . . I was pretty distraught when you guys showed up, [be]cause . . . somewhere down in here, I knew what was happening."  The troopers then shut off the recorder, drove the defendant to the station house, and jailed him.

In due season, a federal grand jury in the District of Maine returned an indictment that charged the defendant with transportation and possession of child pornography.  See 18 U.S.C. § 2252A(a)(1), (5)(B); see also id. § 2256(8)(A).  The defendant moved to suppress all the statements and physical evidence obtained in October of 2007, arguing that the interviewing officers had subjected him to a custodial interrogation without first providing Miranda warnings, that they had exploited his mental condition, and

that they had coerced his consent to the search. The district judge referred the motion to a magistrate judge who, following an evidentiary hearing, recommended that the motion be denied. The defendant seasonably objected. The district judge convened a supplementary hearing and adopted the magistrate judge's proposed findings and recommended decision.

In the wake of this ruling, the defendant entered a conditional guilty plea to both counts, see Fed. R. Crim. P. 11(a)(2), reserving the right to contest the denial of his suppression motion. The district court accepted the conditional plea, found the defendant guilty, and ultimately imposed a 240-month incarcerative sentence on count one, a concurrent 120-month incarcerative term on count two, and a life term of supervised release. This timely appeal followed.

## II. ANALYSIS

The defendant advances four arguments on appeal. First, he contends that statements made during the "knock and talk" interview, which amounted to a confession, should be suppressed because he was not advised of his Miranda rights. Second, he contends that, in any event, those statements were involuntary and, thus, subject to suppression. Third, he contends that the search of the laptops was invalid because his consent to the search had been coerced. Fourth, he contends that the statements made during the interview at PBMC were inadmissible as the fruit of a poisonous

tree.  We address each component of this asseverational array separately.  We start, however, by limning the standard of review.

### A.  **The Standard of Review**.

In reviewing a trial court's denial of a motion to suppress, we assess the court's factual findings for clear error and evaluate its legal rulings de novo.  United States v. Fagan, 577 F.3d 10, 12 (1st Cir. 2009); United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001).  "Under clear error review, we may reverse only if the record, read as a whole, gives rise to a strong, unyielding belief that a mistake has been made."  United States v. Jones, 523 F.3d 31, 36 (1st Cir. 2008) (citation and internal quotation marks omitted).  This deferential standard of review portends that when "the district court chooses to draw a reasonable (though not inevitable) inference from a particular combination of facts," that inference is entitled to respect.  United States v. Espinoza, 490 F.3d 41, 46 (1st Cir. 2007) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)).  Thus, "[i]f any reasonable view of the evidence supports the denial of a motion to suppress, we will affirm the denial."  United States v. Boskic, 545 F.3d 69, 77 (1st Cir. 2008).

### B.  **Miranda Warnings**.

It is common ground that "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must

-11-

first" be given Miranda warnings.  Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) (quoting Miranda, 384 U.S. at 444).  This bedrock rule recognizes that "in a custodial interrogation, the police have the capacity to dominate the scene to such an extent that the risks of coercion and intimidation are unreasonably high."  United States v. Melendez, 228 F.3d 19, 22 (1st Cir. 2000).  The Miranda warnings are designed "to protect against the extraordinary danger of compelled self-incrimination that is inherent in such situations."  Id.

The defendant maintains that his October 18 statements should be suppressed because Miranda warnings, though required, were not administered.  The necessity vel non for Miranda warnings turns on whether a suspect is in custody.  Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam); United States v. Quinn, 815 F.2d 153, 160 (1st Cir. 1987).  When making such a determination, an inquiring court must examine whether "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  Maryland v. Shatzer, 130 S. Ct. 1213, 1224 (2010) (quoting New York v. Quarles, 467 U.S. 649, 655 (1984)).

In the absence of a formal arrest — and in this case, none had occurred at the pertinent time — determining whether a person is in custody ordinarily requires a nisi prius court to engage in a two-step pavane.  First, the court must ascertain the circumstances surrounding the interrogation.  Thompson v. Keohane,

516 U.S. 99, 112 (1995). This assessment is factual in nature and, as such, is reviewed for clear error. See United States v. Ventura, 85 F.3d 708, 711 n.2 (1st Cir. 1996). Second, the court must examine whether, viewed objectively, the discerned circumstances constitute the requisite "restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (internal quotation omitted). This second step, which entails the application of law to fact, engenders de novo review. United States v. Fernández-Ventura, 132 F.3d 844, 846 (1st Cir. 1998).

It bears emphasis that the determination of whether custody exists "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323. Thus, the interrogating officer's intent, not communicated to the individual being questioned, is irrelevant to the inquiry. See Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

This court has identified four factors that, among others, may inform a determination of whether, short of actual arrest, an individual is in custody. These factors include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Ventura, 85

F.3d at 711 (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)); see generally 3 William E. Ringel, Searches & Seizures, Arrests & Confessions § 27:3, at 27-11 to 27-16 (2d ed. 2010) (collecting cases across the circuits that compile similar lists of factors).

With these precepts in mind, we turn to the circumstances of the October 18 interview. To begin, there was no formal arrest. And it is important to note that the interview occurred in surroundings familiar to the defendant: his own home. Though questioning in a suspect's dwelling may at times comprise a custodial interrogation, see, e.g., Orozco v. Texas, 394 U.S. 324, 326 (1969), such a location generally presents a less intimidating atmosphere than, say, a police station. See, e.g., United States v. McCarty, 475 F.3d 39, 42, 46 (1st Cir. 2007).

The defendant's house is small. But there is nothing in the record to suggest that the officers either exploited its cozy confines or invaded the defendant's personal space. This, too, is entitled to weight. See United States v. Nishnianidze, 342 F.3d 6, 13-14 (1st Cir. 2003).

The number of officers assembled on October 18 was impressive but not overwhelming. See, e.g., id. at 12, 14 (finding interrogation non-custodial when questioning conducted by three officers); Quinn, 815 F.2d at 157, 161 (finding no custody despite presence of five officers). Furthermore, although four officers

-14-

trekked to the island, only two of them participated in the questioning; the others remained apart.

Nor was there any show of force. Only two carried visible weapons, and those weapons remained in their holsters throughout the visit. No weapon was ever brandished. This tends to support the district court's finding that the interrogation was non-custodial. Cf. United States v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir. 2007) (finding custody when, inter alia, "the defendant was confronted with an unholstered gun").

In addition, we think it significant that no meaningful physical restraint was applied to the defendant. See Nishnianidze, 342 F.3d at 14; United States v. Zapata, 18 F.3d 971, 977 (1st Cir. 1994). For aught that appears, no officer made physical contact with him.

To be sure, there are two instances of arguable restraint. Neither affects the determination.

The first instance occurred when Lang and Northrup accompanied the defendant outside so that he could smoke a cigarette. While escorting a suspect throughout his home may have some bearing on the custody inquiry, see, e.g., Mittel-Carey, 493 F.3d at 40, there is no evidence that the troopers followed the defendant so closely as to intrude upon any intimate moment or private activity. Consequently, their foray into the yard, viewed objectively, did not approach the level of physical restraint

associated with formal arrest. See United States v. Uzenski, 434 F.3d 690, 704-05 (4th Cir. 2006); cf. United States v. Madoch, 149 F.3d 596, 601 (7th Cir. 1998) (finding that presence of agent while suspect got dressed and pumped breast milk in bathroom was sufficient to establish that she was in custody).

This conclusion is reinforced by the fact that the defendant demonstrated some control over the smoking incident vis-à-vis the ongoing interview. He refused to answer questions while smoking, and the troopers acceded to this refusal. Moreover, it was the defendant — not the troopers — who decided when the interview should resume. These vignettes support the district court's determination that the defendant was not unduly intimidated by the interrogating officers. See Quinn, 815 F.2d at 159.

The second instance of arguable restraint occurred when Johnson took the defendant into protective custody.[3] This incident took place upon the conclusion of the interview and, up until that time, the defendant was not informed that he would be involuntarily committed. The incident could not, therefore, have had any influence on the defendant's willingness to speak. The officers' subjective intent, uncommunicated to the defendant prior to or during the interview, is not germane to the Miranda inquiry.

---

[3] We assume, without deciding, that taking the defendant into protective custody antecedent to an involuntary commitment is the functional equivalent of an arrest.

-16-

United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001); United States v. Streifel, 781 F.2d 953, 959 (1st Cir. 1986).

Last — but far from least — the record amply supports the district court's finding that the ambiance was relaxed and non-confrontational throughout the interview. The troopers' demeanor remained calm, the time of day (late morning) was not menacing, and the defendant was appropriately dressed. The troopers were polite and never hectored the defendant or raised their voices. Details such as these are entitled to some weight in determining whether a particular interrogation was custodial. See, e.g., United States v. Lanni, 951 F.2d 440, 442 (1st Cir. 1991). The relatively short duration of the interview, which lasted roughly ninety minutes, and the twenty minutes' pause taken to summon an EMT to minister to the defendant when he suffered a panic attack are also consistent with the finding that the interview was not custodial. See, e.g., Beckwith v. United States, 425 U.S. 341, 342-43, 347-48 (1976) (concluding that three-hour interview in suspect's home did not implicate Miranda); Lanni, 951 F.2d at 443.

We do not mean to suggest that all the circumstances one-sidedly favor the challenged finding. They do not. Some data points, taken in isolation, tilt toward a finding of custody.

For one thing, although the defendant was told several times that he was not under arrest, he was never explicitly told

-17-

that he was free to terminate the interview.[4]  For another thing, the defendant had been removed from Isle au Haut in the past by law enforcement officers.  But these facts cannot be viewed in a vacuum.  As we have recounted, a number of other circumstances point in the opposite direction.

The question is admittedly close, but its very closeness augurs in favor of affirmance.  Where the signals are mixed, the district court's choice between competing inferences cannot be clearly erroneous.  This is such a case.  Given the district court's factual findings and the deference due to them, the totality of the circumstances supports its conclusion that the defendant's freedom was not restrained to such a degree that a reasonable person in his position would have thought that he was under arrest.  The October 18 interview was, therefore, non-custodial.  Accordingly, we refuse to disturb the district court's determination that no Miranda warnings were required.

## C.  **Voluntariness**.

The defendant next argues that even if Miranda warnings were not required, the statements that he made during the "knock and talk" interview should be suppressed on the ground that they were the product of unlawful coercion.  This argument rests in

---

[4] The district court found that the defendant was told that he did not have to answer any questions.  This finding is unsupported by the record and, thus, is clearly erroneous.  Consequently, we disregard it.

-18-

large part on the fragility of the defendant's mental state at the time of the interview.

The Supreme Court has admonished that "a defendant's mental condition, by itself and apart from its relation to official coercion," can never serve as a sufficient basis for a finding of involuntariness. Colorado v. Connelly, 479 U.S. 157, 164 (1986). In an effort to blunt the force of this admonition, the defendant argues that trickery and deception on the part of the troopers, coupled with his compromised mental state, added up to unlawful coercion. In this regard, he accuses the troopers of intimidation and falsely leading him to believe that he would be allowed to remain on the island at the conclusion of the session.

It is elementary that a coerced confession cannot be admitted to prove a defendant's guilt. Blackburn v. Alabama, 361 U.S. 199, 205 (1960); Spano v. New York, 360 U.S. 315, 320-21 (1959). The court below found the defendant's confession to have been made voluntarily, and the defendant's claim of error requires us to test the supportability of this finding.

When charged with determining whether a confession was voluntary, an inquiring court must sift through the totality of the circumstances, including both the nature of the police activity and the defendant's situation. See Arizona v. Fulminante, 499 U.S. 279, 285 (1991); United States v. Kimball, 25 F.3d 1, 8 (1st Cir. 1994). Relevant considerations may include the length and nature

-19-

of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, bathroom facilities) imposed upon the suspect. See Culombe v. Connecticut, 367 U.S. 568, 602 (1961). They also may include an appraisal of the defendant's attributes, such as his age, education, intelligence, and mental state. Fulminante, 499 U.S. at 286 n.2; Reck v. Pate, 367 U.S. 433, 441-42 (1961). In short, an inquiring court must conduct the juridical equivalent of an archeological dig into the whole of the circumstances. In doing so, we defer to the district court's factual findings, see Fulminante, 499 U.S. at 287, and review its ultimate conclusion on voluntariness de novo. Id.

We start with the police activity. The conditions of the interview, described above, were not ominous. The tone of the interview was cordial, its length was reasonable, and the defendant was not deprived of any essentials.[5] In addition, no inducements were offered and no threats were voiced. When the panic attack occurred, the troopers offered the defendant water and suggested that he might want to eat something to help mitigate the symptoms. These are indicia of a lack of coercion, which support the district court's finding of voluntariness. See, e.g., Boskic, 545 F.3d at 80; United States v. Rojas-Tapia, 446 F.3d 1, 5 (1st Cir. 2006).

---

[5] To be sure, at the time the interview began, the defendant had neither eaten nor taken his antidepressant medication. But there is no claim that the officers prevented him from eating or taking his pills.

The majority of the defendant's personal characteristics likewise support the district court's finding of voluntariness. The defendant was mature but not elderly. He had a high school education and had taken some college courses. There is no indication that he suffered from low intelligence. Finally, he had a respectable employment history, most recently as a self-employed contractor and part-time lobsterman.

With the conduct of the police and the personal characteristics of the defendant tilting in favor of the voluntariness finding, the defendant's argument reduces to little more than reliance on his fragile mental state and the onset of the panic attack. Where, as here, a person's compromised mental state is known to interrogating officers, a lesser quantum of coercion is required to call an ensuing confession into legitimate question. See Hill v. Anderson, 300 F.3d 679, 682 (6th Cir. 2002); United States v. Sablotny, 21 F.3d 747, 751-52 (7th Cir. 1994); see also Nickel v. Hannigan, 97 F.3d 403, 410 (10th Cir. 1996). Nevertheless, some significantly probative evidence of coercion is required.

Here, the troopers had a modicum of relevant knowledge when the interview began: they knew, from the sheriff's files, that the defendant had suicidal ideation and posed a risk to himself if left alone on the island. There is, however, no indication that the troopers knew about the defendant's vulnerability to panic

-21-

attacks. Nor was there any evidence that they attempted to exploit this vulnerability. Indeed, their actions suggest the opposite.

At the first sign of distress, the troopers halted their questioning, fetched a wet cloth as the defendant requested, and summoned medical assistance. They did not resume the questioning until after the EMT (a friend of the defendant's) advised them that the defendant's condition had stabilized and that his vital signs were normal. Even factoring the defendant's compromised mental state into the equation, we cannot say that the district court's subsidiary findings of fact pertaining to the confession were clearly erroneous. See Boskic, 545 F.3d at 77; Rojas-Tapia, 446 F.3d at 3. We therefore conclude, upon de novo review, that the defendant's confession was voluntary. See United States v. Palmer, 203 F.3d 55, 61-62 (1st Cir. 2000); Nickel, 97 F.3d at 411.

The defendant's related claim that the troopers took advantage of his fragile mental state through false assurances does not survive scrutiny. It is beyond hope of contradiction that some aggravated types of police chicanery can render a confession involuntary. See, e.g., Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (holding confession involuntary when police falsely stated that suspect's child would be taken away if she did not confess). But the use of chicanery does not automatically undermine the voluntariness of a confession. See United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998). Law enforcement officers often must

fight fire with fire, and some degree of deception on their part during the questioning of a suspect is permissible. See, e.g., Frazier v. Cupp, 394 U.S. 731, 739 (1969); see also United States v. Flemmi, 225 F.3d 78, 91 n.5 (1st Cir. 2000) (noting that although "trickery can sink to the level of coercion, . . . this is a relatively rare phenomenon"). In this instance, the lower court supportably found that the troopers did not cross the line.

The defendant complains that the troopers led him to believe (falsely) that he would be left on the island, but the government counters that everything the troopers said was literally true. There was never any plan to arrest the defendant then and there. But statements that are literally true can nonetheless be misleading, see, e.g., Byram, 145 F.3d at 408, and we do not rest our decision on this point alone. What is dispositive is that the troopers did not say or do anything that would have suggested to the defendant that his continued stay on the island was contingent upon his cooperation.

In this case, the key question is whether the troopers' actions, viewed objectively, coerced the defendant into speaking. Careful perscrutation of the record fails to disclose any extrinsic factors introduced by the troopers that could have distorted the defendant's judgment about whether to speak freely to them. Thus, the challenged statements can fairly be considered voluntary. See Boskic, 545 F.3d at 80-81; United States v. Jackson, 918 F.2d 236,

242 (1st Cir. 1990); see also Bryant v. Vose, 785 F.2d 364, 368 (1st Cir. 1986) (affirming admission of confession even though it may have been "an emotional response" on the part of the defendant).

Police officers must, of course, be sensitive to a suspect's mental condition. They must exercise caution when dealing with a suspect whose compromised mental state is known to them. Such sensitivity helps to assure an inquiring court that a confession is untainted. The record here affords us that assurance.

### D. **Inevitable Discovery**.

In a parallel vein, the defendant asserts that his consent to the search of his laptops was involuntary because the troopers obtained it by taking advantage of his fragile mental state. The government counters that the defendant had a choice about whether to consent and that his choice was voluntary. The district court found that the defendant had voluntarily consented to the search.

The voluntariness of consent ordinarily turns on questions of fact. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973); United States v. Romain, 393 F.3d 63, 69 (1st Cir. 2004). Consequently, a district court's determination that consent to a search was given voluntarily is reviewed for clear error. Romain, 393 F.3d at 69; United States v. Laine, 270 F.3d 71, 74 (1st Cir.

-24-

2001). This means, among other things, that the court's credibility judgments must be accorded respect. United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003). It also means that the "court's choice between two plausible competing interpretations of the facts cannot be clearly erroneous." Romain, 393 F.3d at 69 (quotation omitted). The ultimate inquiry is whether the evidence, viewed in accordance with these tenets, fairly supports the court's finding.

While the parties invite us to undertake this inquiry, we see no need to accept that invitation. The government has urged an alternative basis for admitting the evidence seized in the search: the inevitable discovery doctrine. That doctrine applies here. Thus, even if we assume, favorably to the defendant, that consent to the search was not voluntarily given, suppression would not lie. See Zapata, 18 F.3d at 978.

The Supreme Court has stated with conspicuous clarity that evidence that "would inevitably have been discovered without reference to the police error or misconduct" may be admitted at trial. Nix v. Williams, 467 U.S. 431, 448 (1984). Such evidence is admissible "so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment." Zapata, 18 F.3d at 978; see

United States v. Silvestri, 787 F.2d 736, 744 (1st Cir. 1986). In the case at bar, all three criteria are satisfied.

First, the defendant's voluntary confession, see supra Part II(C), gave the troopers probable cause to obtain a warrant for the search of both the house and the laptops. In fact, the whole purpose of the "knock and talk" interview was to gather enough information to procure a warrant — and the defendant provided that information in spades. The troopers had support staff on stand-by, ready to apply for a warrant, and the warrant issued the next day. That was sufficient for the inevitable discovery doctrine to take hold: "[T]here is no necessary requirement that [a] warrant application process have already been initiated at the time the illegal search took place." United States v. Jadlowe, 628 F.3d 1, 10 (1st Cir. 2010), cert. denied, ___ S. Ct. ___, 2011 WL 743064 (2011) (first alteration in original) (quoting Silvestri, 787 F.2d at 746).

Second, the discovery of the contraband would have occurred regardless of the defendant's consent. In fact, some of the videotapes were turned over by the defendant prior to the discussion about a search. The remaining contraband (and the laptops themselves) would have remained at the house, no one but the defendant would have had either access to the property or any incentive to destroy the images, and the defendant could not have done so (he was an in-patient at PBMC throughout the week). Nor

-26-

was there any doubt about what to look for; the troopers knew about the existence of the images both from their conversations with S.J. and from the defendant's confession. Moreover, the defendant had informed the troopers of the location of the images. These data points collectively satisfy the second prong of the test. See United States v. Almeida, 434 F.3d 25, 29 (1st Cir. 2006).

Third, the application of the inevitable discovery doctrine here will not erode the prophylactic effect of the exclusionary rule. Nothing in this application of the doctrine would encourage police misconduct or significantly weaken Fourth Amendment protections. Law enforcement officers would be foolhardy to rely on the inevitable discovery doctrine in the mine-run of cases in which, unlike in this case, they would be hard-pressed to show that the evidence would be preserved for later discovery when left in the suspect's home.

If more were needed — and we doubt that it is — the record shows that the troopers had no incentive to transgress the defendant's constitutional rights in order to resort to the inevitable discovery doctrine. That lack of incentive deserves weight in considering the third prong of the test. See United States v. Scott, 270 F.3d 30, 45 (1st Cir. 2001); United States v. Ford, 22 F.3d 374, 380-81 (1st Cir. 1994). This circumstance, together with the troopers' efforts to obtain valid consent and the issuance of a proper search warrant the next day, suggest that any

failure to adhere to Fourth Amendment standards was wholly inadvertent. The absence of any such intent helps the government to carry its burden. United States v. Pardue, 385 F.3d 101, 108 (1st Cir. 2004).

In sum, this is a classic case for application of the inevitable discovery doctrine. Where, as here, lawful independent means leading to the discovery of the evidence necessarily would have been employed, those means undoubtedly would have yielded up the evidence, and invocation of the inevitable discovery doctrine would not affect the core values of the Fourth Amendment, it follows inexorably that the evidence seized was lawfully used against the defendant.

### E. Poisonous Tree.

The defendant's final argument focuses on different evidence. He insists that statements he made at PBMC on October 23 must be suppressed as the fruit of a poisonous tree (his coerced confession a week earlier).

We need not tarry. We already have concluded that his earlier confession was lawfully obtained. See supra Part II(C). It follows that there is no poisonous tree. See Oregon v. Elstad, 470 U.S. 298, 314 (1985); United States v. Conley, 156 F.3d 78, 84

(1st Cir. 1998).  The arboretum is pristine and, consequently, the defendant's attack on the October 23 statements fails.[6]

**III.  CONCLUSION**

We need go no further.  Although this case presents close questions, the inferences drawn by the district court from facts that can be read in different ways are both reasonable and fairly supported by the record.  Accordingly, the standard of review requires us to defer to this factfinding and uphold the order denying the motion to suppress.

**Affirmed**.

**— Concurring Opinion Follows —**

---

[6]  We note that the single statement that followed the defendant's invocation of his right to counsel is more problematic. <u>See</u> <u>Edwards</u> v. <u>Arizona</u>, 451 U.S. 477, 484-85 (1981).  The defendant, however, has not made any separate argument in his brief devoted to that statement, nor has he relied on the Sixth Amendment. Accordingly, any free-standing challenge to this single statement is waived. <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

**TORRUELLA, Circuit Judge (Concurring).** As the majority recognizes, this case presents very close questions and the facts here can be interpreted differently. I join the majority because the standard of review on appeal requires us to accept the district court's findings of fact, see Arizona v. Fulminante, 499 U.S. 279, 287 (1991), but I find that the officers in this case came very close to stepping over the line into mental coercion territory. I write separately to emphasize that law enforcement officers ought to use great care when questioning a suspect who is suffering from a weakened mental state.

The officers in this case were aware that Hughes was a suicide risk. Although they did not know about his vulnerability to panic attacks, the defendant's compromised mental state should have been evident when he began hyperventilating, gagging and dry heaving while lying on the floor. The officers should have refrained from the use of any misrepresentation or trickery at that point. We are faced with a situation where a physician who treated the defendant specifically warned the police that their questioning would render Hughes mentally unstable and yet they still chose to use misrepresentation as an interrogation technique. Under these circumstances, where Hughes was so unstable that he had to be involuntarily committed to a hospital for psychiatric care, the officers should have used greater care in questioning him, should have refrained from the use of trickery or misrepresentation and

-30-

should have probably ceased questioning once there was an indication that he was unstable.

My colleagues correctly point out that some degree of deception and chicanery is legally permissible in certain circumstances and that the use of the same does not automatically undermine the voluntariness of a confession. United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998). I do not agree, however, that the use of deception was acceptable in the circumstances of this case where the police knew or reasonably should have known that the defendant was mentally unstable. Nevertheless, I concur because the district court's findings of fact are subject to clear error review. Fulminante, 499 U.S. at 287. We must therefore defer to the district court's finding that the officers neither engaged in conduct that could reasonably be perceived as intimidating nor conditioned Hughes' ability to stay at home on his cooperation with the investigation.

I would also like to emphasize that the statement that "[l]aw enforcement officers often must fight fire with fire, and some degree of deception on their part during the questioning of a suspect is permissible[,]" should not be construed as our attempt to condone police skulduggery. My colleagues clearly warn that police officers must be cautious when dealing with a suspect who has a weakened mental state.